No. 102,931

STATE OF KANSAS, *Appellee*, v. KENNETH E. WILSON, *Appellant.*

(289 P.3d 1082)

Opinion filed September 28, 2012.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause, and *Heather Cessna*, of the same office, was on the brief for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Clay Britton*, assistant solicitor general, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: A jury convicted Kenneth E. Wilson of premeditated first-degree murder, aggravated burglary, burglary, and criminal possession of a firearm. In this direct appeal, Wilson contends the district court abused its discretion in admitting an audio recording of a 911 call made by the murder victim's wife and in admitting evidence of seven uncharged burglaries allegedly committed by Wilson for the purposes of proving identity and plan under K.S.A. 60-455. Wilson further asserts the prosecutor committed misconduct by commenting on facts not in evidence and by improperly shifting the burden of proof to Wilson and that the cumulative effect of these errors deprived him of his right to a fair trial.

Wilson also asserts multiple sentencing errors: (1) the district court erred in finding two aggravating circumstances and imposing a hard 50 sentence, (2) the hard 50 sentencing scheme is unconstitutional, (3) the district court's order requiring lifetime offender registration fails to conform to the governing statutory provisions, and (4) his Sixth and Fourteenth Amendment rights were violated by the court's use of his prior criminal history and imposition of an aggravated grid-box sentence without proof beyond a reasonable doubt to a jury.

## FACTUAL AND PROCEDURAL BACKGROUND

Wilson was charged and convicted of premeditated first-degree murder, aggravated burglary, burglary, and criminal possession of a firearm. We have briefly summarized below the evidence developed at trial as to each conviction.

*First-degree murder, aggravated burglary, and criminal possession of a firearm convictions*

Wilson's first-degree murder, aggravated burglary, and criminal possession of a firearm convictions stem from the burglary of the home of Scott and Carol Noel ("the Noels") on March 25, 2008, and the murder of Scott Noel in his home that same date.

Carol Noel testified at trial that she and Scott both left their rural home, which was 1 mile south of Portis and approximately ½ mile from Highway 281, about 7:30 a.m. on March 25, 2008. On a typical day, Scott, a farmer, would return home for lunch at noon.

When Carol returned home at 4 p.m., things were "topsy turvy." As she entered the dining room, she saw that dining room chairs had been knocked over, the table cloth was on the floor, and money she had left that morning on the dining room table for Scott was gone. As Carol entered the kitchen, she saw one of her husband's guns lying on the kitchen table, although Scott always kept his unloaded guns in the closed gun cabinet. She then saw Scott lying dead on the kitchen floor in a pool of blood, his hands tied behind his back. Carol frantically called 911 and, at the direction of the dispatcher, waited outside until law enforcement arrived.

The coroner later determined Scott died of a contact gunshot wound to the back of his head and that he had been severely beaten shortly before he died, as evidenced by several bruises and abrasions on his body. The coroner testified there was no evidence that Scott had fought back or taken any defensive measures.

Cory Latham, an investigating officer with the Kansas Bureau of Investigation, testified that when the murderer pulled the trigger, he likely was standing over Scott, who lay on his stomach on the floor with his hands tied behind his back with a computer cord.

During the subsequent investigation, officers found a cigarette butt in the Noels' sun room, although neither Carol nor Scott smoked cigarettes. Laboratory testing of the cigarette butt revealed a DNA profile that matched Wilson's DNA profile.

Wilson's former wife, Sharon Wilson, testified that in March 2008, she and Wilson were still married and lived together in a home in Salina. Sharon testified that from March 24, 2008, through March 29, 2008, Wilson was away from home on a trip with his friend Delbert McBroom, who was staying in an RV owned by the Wilsons in the Wilsons' backyard. Sharon believed that Wilson and McBroom were going to western Kansas to look for oil rigging jobs. Sharon also testified that Wilson and McBroom were gone on a trip on March 14, 2008, although she could not recall how long they were gone on that trip. Sharon testified Wilson was known to smoke cigarettes.

Two witnesses testified they saw an unfamiliar car matching the description of Wilson's car leaving the Noel house about the time of the murder.

*Burglary conviction*

Wilson's burglary conviction stems from a burglary of Elinor Fink's home that occurred on the same day Scott Noel was murdered. Fink lived west of Downs on U.S. Highway 24 approximately 3 miles from the Noels' farm. On March 25, 2008, she went to lunch at the Downs senior center around 11 a.m. When she returned home about 12:45 p.m., she discovered her home had been broken into, ransacked, and all of her jewelry taken. She

called 911 and reported the burglary. Several pieces of Fink's jewelry were later found in a search of Wilson's home.

*Wilson's defense*

Wilson testified in his own defense and denied committing the crimes charged. He admitted he was on a trip from March 24 to March 25, 2008, and that he drove from Salina to Fairbury, Nebraska, and back to Salina on that trip, but he claimed he was hauling suitcases in return for payment from a man he had "done time with." Wilson also admitted he drove all over Kansas the week of March 12, 2008. Regarding the items from numerous burglaries found in his possession, Wilson claimed he bought several boxes of items from the man for whom he was hauling suitcases and then later learned the boxes contained the stolen items. Wilson was unable to offer any explanation as to why his DNA was found on cigarette butts in the Noel home and in the home of Joel Livgren, the victim of an uncharged burglary introduced into evidence under K.S.A. 60-455.

Wilson testified regarding his two prior felony convictions. The first he explained by saying that he was convicted of "purse snatching" after he "beat a woman unmercifully" because she looked like his ex-fiancée. In cross-examination, he conceded he was convicted of robbery in the first degree. The second offense, which Wilson said occurred after he served 18 months in prison for the first offense, resulted after he again saw a woman who looked like his ex-fiancée and he "put a knife through her throat and mock-raped her." Wilson explained that he was convicted of rape and aggravated kidnapping for that incident and incarcerated for 18 years before his release in 2002.

Wilson said he was eventually arrested in June 2008 when he violated his parole by driving with a suspended license.

In cross-examination, Wilson was presented with a letter he wrote to McBroom after Wilson was jailed for the parole violation. He admitted to writing the letter, which asked McBroom to find out where Wilson's parole officer lived and to "try and get some leather gloves and stocking caps rounded up on the sly."

Wilson admitted that he was angry with his parole officer, that threatening and intimidating was "part of [his] character," and that his purpose in asking where his parole officer lived had to do with this character. However, he claimed that although he threatened and intimidated people all the time, he didn't necessarily "go as far as to carry those things through," and he claimed he had no intention of threatening his parole officer. He further suggested that he asked McBroom to round up gloves and stocking caps on the sly for innocent reasons, namely because he liked to fish "neck deep in water in the river, [and] it gets mighty cold."

*Sentencing*

The sentencing court imposed a hard 50 sentence for the first-degree murder conviction after finding four aggravating circumstances. Specifically, the court found Wilson committed the instant crimes for the purpose of receiving money or any other thing of monetary value; in order to avoid or prevent a lawful arrest or prosecution; and in an especially heinous, atrocious, or cruel manner. See K.S.A. 21-4636(c), (e), and (f). Further, the court found Wilson had previously been convicted of a felony in which great bodily harm was inflicted. See K.S.A. 21-4636(a). Wilson presented no evidence of any mitigating circumstances. Additionally, the sentencing court imposed consecutive sentences of 136 months' imprisonment for the aggravated burglary conviction, 13 months' imprisonment for the burglary conviction, and 9 months' imprisonment for the criminal possession of a firearm conviction.

## ANALYSIS

*The district court did not abuse its discretion in admitting the 911 recording.*

In this direct appeal, Wilson first challenges the district court's admission of the recording of Carol's 911 call after she discovered her husband's body. For the reasons discussed below, we conclude the district court did not abuse its discretion in permitting the jury to hear a portion of that recording at trial.

*Facts and procedural history*

During trial but prior to seeking admission of the audio recording of Carol's 911 call, the State filed a trial brief arguing the recording was admissible. Outside the presence of the jury, Wilson objected to the introduction of the recording as prejudicial. He argued it would create "more sympathy and emotion for the Noel family."

The district court treated the arguments in the nature of a motion in limine and concluded the recording was not unnecessarily cumulative and "at present the probative value of that evidence might outweigh its prejudicial effect."

Wilson renewed his pretrial objection when the State offered the recording of the 911 call during Carol's direct testimony. The district court admitted the exhibit, and the State played the recording for the jury. Two minutes and 30 seconds into the recording, the district court *sua sponte* requested the State stop the CD. The court stated it felt that "we'd reached that point where the necessary information had been provided."

Later, when discussing admitted exhibits, the State noted that the CD of State's Exhibit 1 contained both the recording of the 911 call, a portion of which had been played for the jury, and Exhibit 1-A, a recording of a call from the dispatcher back to Carol. The district judge noted for the record:

> "The Court, in listening to the CD, together with those others who were in the courtrooms, came of the opinion that it had reached a point where the prejudicial effect of what was being played outweighed the probative value of that. There was a pretty long period of time where essentially the only thing the Court heard was wailing, was wailing from the, Ms. Noel, and I felt that it had reached that point where listening to more of that had no particular probative value. The tape was shut off.
>
> "I don't want to foreclose the State, though, from coming back in and presenting additional evidence, additional information from that CD, should they believe such other information might have some probative value that outweighs the prejudicial effect."

The judge further stated, "I don't feel it was prejudicial up to that point in time."

On appeal, Wilson concedes the relevance of the 911 recording but argues the district court abused its discretion by admitting the recording because its prejudicial effect outweighed the probative value. Wilson contends the probative value of the recording was minimal because "it served only to corroborate minor elements of the case that were not the primary issues in dispute at trial, and it was highly prejudicial as it had the tendency to inappropriately inflame the passions and prejudices of the jury."

The State contends the district court did not abuse its discretion in admitting the recording of the 911 call because it was highly probative (1) to corroborate Carol's trial testimony; (2) to establish that Carol did not contaminate the scene; and (3) to show premeditation—a key element of the State's case. The State further suggests that even if the district court did abuse its discretion, the error was harmless in light of the direct and overwhelming nature of the evidence.

*Standard of review*

Even if evidence is both probative and material, the trial court must still determine whether the probative value of the evidence outweighs its potential for producing undue prejudice. We review this determination for abuse of discretion. *State v. Wells*, 289 Kan. 1219, 1227, 221 P.3d 561 (2009); see *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011) (stating abuse of discretion standard of review), *cert. denied* 132 S. Ct. 1594 (2012).

*Discussion*

In the trial court and in his brief on appeal, Wilson argued the 911 recording should not be admitted because its undue prejudice outweighed its probative value. At oral argument, however, Wilson switched tactics and argued the district court abused its discretion by failing to listen to the recording before ruling on its admission. Based on the record before us, we cannot say with any certainty whether the trial judge listened to the recording prior to ruling on the call's admissibility. We note that the better practice would be for the party challenging the admission of a recording to request the court listen to the recording at the time of ruling in order to preserve an argument for appeal. But ultimately, we will not ad-

dress this new argument on appeal because Wilson did not raise it below. See *State v. Warledo*, 286 Kan. 927, 938, 190 P.3d 937 (2008) (issues not raised before the trial court cannot be raised on appeal). We will, however, address his challenge to the admission of the recording as more prejudicial than probative.

As the State submits, we have traditionally upheld the admission of recordings of 911 calls at trial. In most of those cases, however, the recording captured the event—*i.e.*, the rape or shooting—at issue in the case. See *State v. Reed*, 282 Kan. 272, 274, 281-82, 144 P.3d 677 (2006) (recording of a 911 call capturing the events of a shooting that left one person dead and another wounded corroborated the testimony of the 911 dispatcher and victim as to the events and "also captured Reed's demeanor at the time of the events, documented events and the duration of the incident, and was highly probative with respect to the essential element of premeditation"); *State v. Meeks*, 277 Kan. 609, 618-20, 88 P.3d 789 (2004) (recording of 911 call made during a shooting was relevant to " 'convey[] what was going on at the scene at that moment' " and to corroborate witness testimony), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006); *State v. Abu-Fakher*, 274 Kan. 584, 597-98, 56 P.3d 166 (2002) (audio recording that captured shooting was properly admitted because "[t]he recording is the most probative and comprehensive evidence of the actual commission of the crime, the sequence in which events occurred, and their duration; it provides considerable context for the manner of death and time span in which the events took place"); *State v. Williams*, 235 Kan. 485, 493, 681 P.2d 660 (1984) (911 recording of a rape was not so gruesome as to be more prejudicial than probative because "[t]he recording went to the very heart of the case showing the victim's lack of consent, that her resistance was overcome by force or fear, and that the sexual assault occurred" and the recording corroborated testimony of several witnesses, including the victim).

Unlike the cases cited above, the recording of the 911 call at issue here did not capture Scott's murder and was not as strongly corroborative as the recordings admitted in those prior cases. Nevertheless, the recording was relevant to corroborate Carol's testi-

mony regarding the scene as she found it and whether the scene had been contaminated, a defense raised by Wilson at trial. The recording additionally was relevant to the issue of premeditation, an essential element of the State's case, because on the tape, Carol "described that her husband was lying on the floor, with his hands tied behind his back, and had been shot in the back of the head."

As noted earlier, Wilson concedes the recording's relevance but argues that despite its probative value, the recording was highly prejudicial because of Carol's hysterical crying. Wilson notes the judge ordered the State to stop the recording because he was concerned about its prejudicial value. But Wilson ignores the trial court's statement when it stopped the recording that "it had reached that point where listening to more of that had no particular probative value" and the court's later verification that the court did not believe the statement was prejudicial "up to that point in time."

Having listened to the recording, we conclude the district court did not abuse its discretion in finding that at least up to the time the court stopped the recording, the probative value of the evidence outweighed its potential for producing undue prejudice.

*The district court did not abuse its discretion in admitting K.S.A. 60-455 evidence.*

Prior to trial, the State moved to admit evidence of seven uncharged burglaries committed in other counties or jurisdictions. The State argued the burglaries were admissible under K.S.A. 60-455 for the purposes of proving plan and identity. The district court agreed, and conditionally granted the State's motion.

At trial, Wilson renewed his objection to admission of evidence of the uncharged burglaries. The district court denied the objection but granted Wilson a continuing objection. We have summarized below the evidence presented by the State as to each of the uncharged burglaries.

### Evidence of uncharged burglaries

On March 12, 2008, the home of Tracy Noel ("Tracy") was broken into between 7:15 a.m. and 12:30 p.m. Tracy lived in Gove County, Kansas, off County Road 58 approximately 9 miles from Highway 23 and ¼ mile from her nearest neighbor. The window

in the back door had been broken, and numerous items were missing, including a pillowcase, jewelry, digital cameras, a video camera, a PlayStation 2 console and corresponding controllers, and video games.

The home of Bernice and Terry Blakely was broken into on March 12, 2008, between 7:30 a.m. and 5:30 p.m. The Blakelys lived in Beeler, Kansas, on County Road 532, approximately ½ mile from Highway 96. Numerous items were missing, including pillowcases and jewelry. Terry found his .270 caliber, high-powered rifle loaded and lying on top of a deep freeze chest in the utility room. Terry usually kept his guns unloaded and standing in a corner of a closet off the utility room. Although neither Bernice nor Terry smoke, Bernice found cigarette butts in the backyard after the burglary.

Loa Hagelgantz lived north of Bazine, Kansas, off County Road 160 about ½ mile from County Road Double D and 3 miles north of Highway 96. Her nearest neighbor lived approximately 1 ½ miles away. The morning of March 13, 2008, Hagelgantz returned home about mid-morning after spraying nearby fields on the family farm. As she drove into her yard, she saw a gray car come around the driveway from the shed near the house. Hagelgantz got out of her car and spoke to the driver, who asked where the nearest town was to get gas. Hagelgantz later identified Wilson from a photo lineup as the man she spoke with that morning. As Hagelgantz entered the house, she smelled cigarette smoke, although no one in the home smoked. Hagelgantz found the stereo cabinet open and CDs and mud on the floor. Her purse was missing.

On March 14, 2008, Matthew Andrews' home was broken into sometime between 8:30 a.m. and 3:30 p.m. Andrews lived 2 miles north of Elwood, Nebraska, approximately 100 yards off Highway 283. Items missing from the Andrews' home included a pillowcase, jewelry, a rifle, cash, silverware, binoculars, video games, and bonds.

Betty Switzer lived in Harvard, Nebraska, approximately ¼ mile off Highway 14 and ½ mile away from her nearest neighbor. In March 2008, while Switzer was in Nevada, her home was broken

into. Numerous items were missing, including a microwave and jewelry.

Taylor and Tara Pope lived outside Saronville, Nebraska, off Highway 6. Their rural home was broken into on March 24, 2008, between 7:30 a.m. and 6 p.m. The dining room window was broken, and items missing included a laptop computer, digital camera, video camera, binoculars, hunting knives, jewelry, and a case of CDs.

Also on March 24, 2008, Joel Livgren's home was broken into between 7 a.m. and 5:30 p.m. Livgren lived 2 miles south of Clay Center, Nebraska, off Highway 14. Items missing included a digital camera, a pillowcase, a pocket watch, a ring, and a handheld portable TV. The DNA profile obtained from a cigarette butt found in Livgren's backyard on March 27, 2008, matched Wilson's DNA profile.

Elinor Fink, Tracy Noel, Bernice Blakely, Betty Switzer, Matthew Andrews, Tara and Taylor Pope, and Joel Livgren later identified items found in a search of Wilson's home and RV as items taken from their homes during the burglaries.

At the time of Wilson's offense, K.S.A. 60-455 provided:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

On appeal, Wilson concedes that both identity and plan were material and in dispute, but he argues the uncharged burglaries were irrelevant to prove those disputed material facts. Wilson contends the seven burglaries were not substantially similar to the charged offenses and thus did not have any tendency in reason to prove the disputed material facts of plan and identity. He reasons that "when viewed as a whole, the entire group of nine crimes may appear as though they are similar, however, when broken down and compared to the two sets of crimes actually charged in this case, the similarities are lacking." The State argues the district

court did not abuse its discretion in admitting the evidence to show identity and plan because the uncharged burglaries were sufficiently similar to the charged crimes to make them relevant and admissible.

Wilson also argues the uncharged burglaries should not have been admitted because their probative value did not outweigh the potential for undue prejudice. He maintains the admission of the evidence against him was particularly prejudicial because his participation in the uncharged and unproven burglaries was based on speculation and inference stacking.

The State counters that the issue of identity was "the most hotly contested issue of the trial" based on Wilson's theory of defense and his testimony at trial, and the evidence of other burglaries was highly probative to this issue.

### Standard of review

A district court applies a several-step analysis to determine whether and how evidence is admissible under K.S.A. 60-455. First, the court must determine that the fact to be proven is material, *e.g.*, concerning intent, motive, knowledge, or identity. The court must also determine whether the material fact is disputed and whether the evidence is probative, *i.e.*, has any tendency in reason to prove the fact. Materiality and probative value are the two components of relevance. If the evidence is probative of a disputed material fact, then the court determines whether the probative value of the evidence outweighs the potential for creating undue prejudice. Finally, if the court decides to admit the evidence, it must give a limiting instruction informing the jury of the specific purpose for the admission of the K.S.A. 60-455 evidence. *State v. Hollingsworth*, 289 Kan. 1250, 1258, 221 P.3d 1122 (2009); *State v. Riojas*, 288 Kan. 379, 383, 204 P.3d 578 (2009).

Our standard of review differs depending upon which step of the above analysis we are considering. We review the materiality determination de novo, while we apply an abuse of discretion standard to the probativity determination. We also apply an abuse of discretion standard to the district court's balancing of probative

value and the potential for producing undue prejudice. *Hollingsworth*, 289 Kan. at 1258.

### Relevance of uncharged burglaries to identity

In arguing the district court abused its discretion in admitting the seven uncharged burglaries, Wilson concedes the evidence concerned the material facts of identity and plan and that these issues were disputed. Therefore, he concedes the evidence satisfied the first two steps of the above analysis. But Wilson argues that the evidence was not probative of the disputed material facts and thus was irrelevant. Specifically, he suggests that the individual uncharged burglaries were too dissimilar from the charged offenses to be probative.

"Where a prior conviction is offered for the purpose of proving identity, the evidence should disclose sufficient facts and circumstances of the offense to raise a reasonable inference that the defendant committed both offenses. Similarity must be shown in order to establish relevancy. It is not sufficient simply to show that the offenses were violations of the same or similar statutes; there should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable inference that the same person committed both offenses. However, the prior offenses need only be similar, not identical, in nature." *State v. Higgenbotham*, 271 Kan. 582, Syl. ¶ 3, 23 P.3d 874 (2001).

In *State v. Howard*, 220 Kan. 117, 120, 551 P.2d 835 (1976), we upheld the admission of a prior burglary in a burglary case as relevant to proof of identity, finding the facts demonstrated a similarity of pattern in the two crimes in five respects: "First, both convictions were for burglary. Second, in both cases a television set was involved. Third, both burglaries were within five blocks of defendant's house. Fourth, entry into the residences was gained by forcing open a door. Finally, in both cases no one was home during the burglaries."

Here, Wilson asserts the "only common threads that run through all nine burglaries is that they were rural residences, burgled during the day when it was most likely that no one would be home, where items of value were taken, all committed sometime between mid to late March of 2008."

But Wilson ignores numerous similar factual circumstances that raise a reasonable inference that Wilson committed all nine offenses. For instance, the rural residences were all relatively isolated with no near or adjacent neighbors; the residences were all near a highway; the residences were within a limited area in north-central Kansas and south-central Nebraska; and the residences were all unoccupied at the time of the burglary.

Moreover, the burglaries all were committed within the same general time frame as the charged burglaries. Four of the burglaries occurred between March 12, 2008, and March 14, 2008 (Tracy Noel, Blakely, Hagelgantz, and Andrews homes). Another four burglaries occurred between March 24, 2008, and March 25, 2008 (Scott and Carol Noel, Fink, Pope, and Livgren homes). The remaining burglary occurred sometime in March 2008 while the owners were out of state (Switzer home). Significantly, the evidence established that Wilson was away from his home in Salina on trips around the time of the burglaries.

Other similarities exist between some of the uncharged burglaries and the charged burglaries. For instance, at the Scott Noel and Blakely homes, previously unloaded guns were removed from their customary locations, loaded, and left out in an obvious location. Also, officers found cigarette butts at the Noel, Blakely, and Livgren homes; and Loa Hagelgantz reported smelling cigarette smoke immediately after Wilson left her home. The evidence showed that the Noels, the Blakelys, and the Hagelgantzes do not smoke while Wilson does smoke. DNA profiles from the cigarette butts found at the Noel and Livgren homes matched Wilson's DNA profile. Further, Hagelgantz identified Wilson in a photo lineup as the man she saw and spoke to outside her home the morning of the burglary. And finally, while Wilson recognizes that items of value were taken during all robberies, he fails to point out that items taken during the burglaries of the Fink, Tracy Noel, Blakely, Switzer, Andrews, Pope, and Livgren homes later were found in Wilson's home and RV.

In sum, evidence of the underlying facts showing the manner in which the Tracy Noel, Blakely, Switzer, Andrews, Pope, and Livgren burglaries were committed—particularly evidence of the lo-

cations of the crimes and general time frame of the crimes, and evidence that stolen items from these homes were recovered in Wilson's home or RV—raises a reasonable inference that the same person—Wilson—committed those burglaries and the Fink burglary. Evidence of the underlying facts showing the manner in which the Hagelgantz burglary was committed—particularly evidence surrounding the smell of cigarette smoke, Hagelgantz' identification of Wilson as outside her home, and Wilson's DNA profile on the cigarette butt found at the Noels' home—raises a reasonable inference that the same person—Wilson—committed the Hagelgantz burglary and the aggravated burglary of the Noels' home. The district court did not abuse its discretion in finding that evidence of the seven uncharged burglaries met the probativity element of relevance to prove the disputed material fact of identity.

*Evidence of plan*

Because we have determined that the evidence was admissible to show identity, we need not consider Wilson's argument that the evidence was inadmissible to prove plan. Even if admission on that ground was erroneous, the evidence was properly before the jury to show identity. The only potential prejudice would be that the additional ground was included in the limiting instruction. See *State v. Inkelaar*, 293 Kan. 414, 426, 264 P.3d 81 (2011).

"An overbroad limiting instruction on K.S.A. 60-455 evidence will be deemed harmless error if the defendant was not prejudiced by the inclusion of more material facts than were warranted by the evidence in the case." *State v. Edwards*, 291 Kan. 532, Syl. ¶ 11, 243 P.3d 683 (2010). We discern no basis for the additional factor of plan to have caused jury confusion or other prejudice, and the limiting instruction, even if overly broad, instructed the jury that the evidence of other crimes could be considered solely for the purpose of proving defendant's identity and/or plan. See *Inkelaar*, 293 Kan. at 426. Under these circumstances, we conclude that even if it was error to admit the evidence to prove plan and include the factor of plan in the limiting instruction, Wilson was not prejudiced by that error.

*Probative value of the evidence versus potential for creating undue prejudice*

The district court found the probative value of the seven uncharged burglaries outweighed the potential for undue prejudice to Wilson and that any potential prejudice could be remedied by a limiting instruction. On appeal, Wilson contends the district court abused its discretion in making that finding because any probative value of the evidence of the uncharged burglaries was "minimal at best." Wilson points out that his DNA was found on the cigarette at the Noels' home and items stolen from Fink's home were found in his possession, and, therefore, he seems to suggest that identity was not a significant issue. But Wilson also inconsistently asserts that the evidence was not overwhelming in this case because "the only evidence linking Mr. Wilson to the Scott Noel murder and burglary was DNA evidence, which the defense pointed out was potentially contaminated at the scene and suspicious, given the initial indication that there was no DNA to be tested from that cigarette butt."

We agree with the State that identity "was the most hotly contested issue of the trial" and the evidence of the uncharged burglaries had significant probative value to that issue. Further, in considering prejudice, we cannot ignore the district court's limiting instruction to the jury to consider the evidence only for the purposes of identity and plan, and we presume the jury followed that instruction. See *State v. Becker*, 290 Kan. 842, 856, 235 P.3d 424 (2010) (appellate courts presume a jury followed jury instructions). Given the highly probative nature of the evidence and the issuance of a limiting instruction, we conclude the district court did not abuse its discretion in determining that the probative value of the evidence of the seven uncharged burglaries was not outweighed by the potential for undue prejudice.

*The prosecutor did not commit reversible misconduct.*

*Commenting on facts not in evidence regarding the Hagelgantz burglary*

Relying upon the following comment by the prosecutor during closing argument, Wilson contends the prosecutor committed misconduct by commenting on facts not in evidence:

"We also have on this same trip a burglary that was interrupted. Loa Hagelgantz, that's letter C—and the legend here has all of these to help you remember. In letter C, Loa Hagelgantz told you she was the woman who came home, and we have a picture of the Hagelgantz farm and house. She told you she pulled in that driveway and as she came in, a car pulled out from behind the shed in the bottom of the picture and came up and stopped. The individual talked to her, and he had a story about he needed to know where the next town was because he needed some gas. Well, you can consider what was the car doing behind the shed at the farm? Ms. Hagelgantz said she was uncomfortable, that as he drove away, if he started to come back, she was going to go in and lock the door and not let that person in.

"And what was that person doing? We know that Wilson and McBroom left Salina together, that they were gone in that time period, March 12 to March 14, and they came back together. But there was one person in the car, and Ms. Hagelgantz looked at a photo lineup and she looked through all those photographs, and that's an exhibit, she found four that seemed familiar, and one that most resembled the person she met in the driveway.

"What was he doing? He was asking her about gas. The other person that was with Wilson? Did that give him time to leave the back of the house and go up that draw you see there and meet him on the road? Was McBroom the lookout who called Wilson add [sic] said, somebody is coming home. Get in the car, let's go. That's for you to consider and decide and determine. The one person Ms. Hagelgantz identified, at least we know, it was the defendant, Kenneth Wilson."

Pointing to the last paragraph, Wilson asserts the prosecutor argued facts not in evidence when he alleged McBroom accompanied Wilson and acted as a lookout at the Hagelgantz burglary. The State insists the prosecutor appropriately drew a reasonable inference from the facts and maintains the prosecutor's statements were well within the wide latitude afforded a prosecutor during closing argument.

In reviewing Wilson's allegations of prosecutorial misconduct, we must first determine whether the comments were outside the wide latitude allowed the prosecutor in discussing the evidence. If so, we then consider whether the improper comments constituted plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Naputi*, 293 Kan. 55, 58, 260 P.3d 86 (2011).

"Although prosecutors may argue reasonable inferences from the evidence, prosecutors may not comment upon facts outside the evidence. When a prosecutor argues facts that are not in evidence, appellate courts have consistently found

that the first prong of the prosecutorial misconduct test is met." *State v. King*, 288 Kan. 333, Syl. ¶ 10, 204 P.3d 585 (2009).

Wilson points out that Hagelgantz testified she saw only one person in the car leaving her house after it had been burglarized. Thus, he contends the prosecutor's statements in closing argument suggesting that McBroom accompanied Wilson on that burglary and acted as a lookout for Wilson were unsupported by the evidence.

But we need not decide whether the prosecutor's comment regarding McBroom's whereabouts during the Hagelgantz burglary were outside the evidence because even if we assume the prosecutor's comments were erroneous, they were not prejudicial. That is because it made no difference whether McBroom was present at the Hagelgantz burglary, because Hagelgantz identified Wilson as the man she saw in the car that morning who asked her where to find the nearest town in order to get gas.

### Improperly shifting the burden of proof

Wilson also argues the prosecutor improperly shifted the burden of proof to Wilson during closing argument when he implied that Wilson should provide an innocent reason as to why his DNA was found on cigarette butts at two crime scenes.

The prosecutor stated:

"But how do we know it's the defendant in Scott Noel's home on March 25th when that murder happens? There is the DNA that Mickie McGinnis told you about. The defendant's DNA is found and recovered in the sun room, and the law enforcement agents testified about Scotty Becker went in and he saw the cigarette butt on the floor and photographed it, and he told Agent Latham who was going to work the crime scene that there is a cigarette butt in the sun room. They're paying close careful attention to it.

"This cigarette butt was recovered a short distance in the house from Scott Noel's body. It was sent to the KBI lab. It was tested for DNA. They got a complete DNA profile on that cigarette butt, and they compared it to a known sample from the defendant, Kenneth Wilson, and it was a match.

"You, as I've told you, give whatever weight and credit you can to the testimony that Ken Wilson brought you in this case. But at the end of the day, even under Wilson's version, which he sat up here and told you about, he has no explanation about how his DNA is on a cigarette butt found outside the Livgren home, and he has absolutely no explanation, he couldn't give you a single innocent reason on

why his cigarette, why DNA is found on a cigarette butt recovered from the sun room of the Noel home when they're processing the murder scene."

Pointing to the last paragraph, Wilson asserts the prosecutor implied that Wilson was burdened with providing an innocent reason as to why his DNA was found on a cigarette butt at the crime scene. The State contends this argument was made in the context of assessing Wilson's credibility and pointing out weaknesses in Wilson's defense.

Wilson cites *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), in support of his argument. In *Tosh,* the prosecutor rhetorically asked in closing argument, " ' "[I]s there any evidence that it didn't happen? Is there any evidence that the things she told you didn't happen?" ' " 278 Kan. at 92. We held that these comments were improper attempts to shift the burden of proof. 278 Kan. at 92; see also *State v. Stone*, 291 Kan. 13, Syl. ¶ 4, 237 P.3d 1229 (2010) ("It is improper for the prosecutor to attempt to shift the burden of proof to the defendant.").

The comments made by the prosecutor in this case were not like those made in *Tosh*. Rather, in context, it appears the prosecutor here was commenting on the efficacy of Wilson's defense by pointing out to the jury where Wilson's version of events logically broke down. See, *e.g., State v. Duong*, 292 Kan. 824, 832-33, 257 P.3d 309 (2011) (holding prosecutor's arguments questioning Duong's failure to present evidence of misidentification did not improperly shift the burden of proof to the defense because prosecutor did not call upon defense to disprove the occurrence of a crime but rather pointed out that evidence supporting defense theory was thin); *Stone*, 291 Kan. at 18 (finding prosecutor's statements that defendant had " 'obstacles to overcome' " were within considerable latitude granted to prosecutors to comment on the weaknesses of defenses); *State v. Burden*, 30 Kan. App. 2d 690, 696, 703, 46 P.3d 570 (2002) (finding prosecutor was within her considerable latitude to comment on the weakness of defense when prosecutor stated " 'the most overwhelming thing that the defense cannot overcome in this case is the physical evidence that corroborates [the victim's] initial statements' "), *rev'd on other grounds* 275 Kan. 934, 69 P.3d 1120 (2003).

Significantly, the prosecutor here stressed that the jury should give whatever weight and credit it could to Wilson's testimony. Further, the prosecutor pointed out that "even under Wilson's version of events," there was no explanation for why cigarette butts with Wilson's DNA on them were found at two of the crime scenes. With that qualification, we conclude the prosecutor's comments were within the wide latitude allowed the prosecutor in discussing the evidence and did not improperly attempt to shift the burden of proof to Wilson.

*Reversal is not required due to the cumulative effect of trial errors.*

Wilson argues that even if the issues above do not individually rise to the level of requiring reversal, his convictions should be reversed because the cumulative effect of the errors substantially prejudiced him and deprived him of his right to receive a fair trial. But one error is insufficient to support reversal under the cumulative error doctrine. *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). Because we have found only one potential error here, we reject Wilson's cumulative error claim.

*The sentencing court appropriately imposed a hard 50 sentence.*

Wilson challenges two of the four aggravating circumstances the sentencing court found when it sentenced him to life imprisonment without the possibility of parole for 50 years. Under K.S.A. 21-4635(d), if the sentencing court finds that one or more aggravating circumstances exist and, further, that the existence of those aggravating circumstances is not outweighed by any mitigating circumstances, the court shall sentence the defendant to the hard 50 sentence.

We need not devote further consideration to Wilson's sentencing challenge because Wilson challenges only the district court's findings regarding two of the four aggravating circumstances. Further, Wilson did not proffer, and the sentencing court did not find, any mitigating circumstances. Even if we were to conclude the district court's findings on the two challenged aggravating circumstances were erroneous, the two remaining aggravating circumstances necessarily are not outweighed by mitigating circumstances.

*The hard 50 sentencing scheme is constitutional.*

Wilson argues the hard 50 sentencing scheme is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), because it does not require a jury to determine the facts that increase the defendant's sentence beyond a reasonable doubt. Citing *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), Wilson asks this court to revisit the constitutionality of the hard 50 sentencing scheme "in light of the United States Supreme Court's recent continued invalidations of sentencing schemes that provide for judicial preponderance of the evidence fact finding to increase a defendant's sentences."

We reject Wilson's claim in light of our previous decisions. See *State v. Johnson*, 284 Kan. 18, 22-23, 159 P.3d 161 (2007), *cert. denied* 552 U.S. 1104 (2008). Kansas' hard 50 sentencing scheme, K.S.A. 21-4635 *et seq.*, is constitutional. See, *e.g.*, *State v. Ellmaker*, 289 Kan. 1132, 1156, 221 P.3d 1105 (2009), *cert. denied* 130 S. Ct. 3410 (2010).

*The sentencing court properly determined that Wilson, as a violent offender, is subject to lifetime registration under the Kansas Offender Registration Act.*

On the offender-registration supplement to the journal entry of judgment in this case, the sentencing court marked box (a)(2) in the registration requirement section—"[o]ffender required to register due to violent offender status" based on Wilson's conviction of first-degree murder. The sentencing court marked two boxes on the next page regarding registration terms, including the one stating Wilson is subject to lifetime registration because of a second or subsequent conviction as a "sex offender, violent offender, or other selected crimes (as described in subsections . . . [a][2] . . . on the previous page)."

Wilson contends the journal entry incorrectly reflects he is subject to lifetime registration as a sex offender. He notes that none of his convictions in this case involved a sex offense, thus, "any designation on this journal entry that he is subject to sex offender registration as a result of these crimes is erroneous." Wilson asks

the court to remand his case to the sentencing court for correction of the journal entry.

While the State concedes the sentencing court had no basis upon which to sentence Wilson to lifetime registration for a second sex offense, we believe both parties have misconstrued the journal entry.

To resolve Wilson's claim, we must interpret the provisions of the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 *et seq.* Interpretation of a statute is a question of law over which we have unlimited review. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

Because of his conviction for first-degree murder, Wilson is classified as a violent offender under KORA. See K.S.A. 22-4902(a) (defining "Offender" to include a "violent offender as defined in subsection [d]"), K.S.A. 22-4902(d) (defining "Violent offender" to include any person convicted of first-degree murder). Contrary to both Wilson's and the State's positions, the sentencing court correctly found Wilson was subject to lifetime registration as an offender under KORA. See K.S.A. 22-4906(a)(2) (requiring lifetime registration for second or subsequent convictions of a crime subject to registration requirements). Wilson fails to note that the box checked by the sentencing court on his journal entry was not just for sex offenders, but was also for violent offenders. And the caption heading indicated the registration terms of the particular section were designated by specific subsections on the previous page, including subsection (a)(2) regarding violent-offender status, which had been checked by the sentencing court. Wilson's claim of error misreads the journal entry. The sentencing court did not order Wilson to register as a sex offender, but rather ordered him to register as a violent offender.

*We dismiss one and reject the other of Wilson's remaining challenges to his sentences.*

Finally, Wilson argues the sentencing court's imposition of a sentence in the aggravated grid box violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution as interpreted by *Apprendi* and *Cunningham.* Because we

are without jurisdiction to review Wilson's presumptive sentence, we dismiss this portion of Wilson's appeal. See *State v. Johnson*, 286 Kan. 824, Syl. ¶ 6, 190 P.3d 207 (2008).

Wilson also contends the sentencing court's use of his prior convictions to enhance his sentence without proof to a jury beyond a reasonable doubt violated his rights under the Sixth and Fourteenth Amendments as interpreted by *Apprendi*. We reject Wilson's claim in light of our previous decisions. See *State v. Fewell*, 286 Kan. 370, 396, 184 P.3d 903 (2008) (reaffirming *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 [2002]).

Affirmed in part and dismissed in part.