NOT DESIGNATED FOR PUBLICATION

No. 113,866

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEVEN PETERMAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed December 22, 2017. Affirmed.

*Shannon S. Crane*, of Hutchinson, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., MCANANY and ATCHESON, JJ.

PER CURIAM: A jury sitting in Reno County District Court convicted Defendant Steven Peterman of electronic solicitation of a person he believed to be a child between the ages of 14 and 16 years old and of failure to register as a sex offender. Both crimes are felonies. He raises multiple claimed errors on appeal. We find no basis for reversing the convictions and affirm.

1

A. *Prior sex crimes convictions*

In September 2001, when Peterman was 43 years old, he told a woman that he was interested in making money by publishing sexually explicit photographs of children on the Internet; he wanted to locate young girls to photograph; and he was particularly interested in runaways because nobody cared about them. Later that same month, Peterman called the same woman to see if she was interested in participating in his venture. In response, the woman described a fictional 10-year-old child. Peterman told the woman to bring the girl to him at a motel room so he could photograph the child as he penetrated her vagina with "equipment." The woman contacted the police and told them about Peterman's proposition.

Peterman drove to a residence to meet with the woman, who again called the police before going outside to talk with Peterman in his truck. Peterman wanted her to bring the child to him that evening. He showed the woman a briefcase containing sex toys and portfolio of photographs of female children involved in sexual acts. Peterman graphically explained to the woman why he liked young girls and how he undertook sexual encounters with them to minimize injury.

Law enforcement officers responded to the woman's call and approached Peterman's truck while he and the woman were still sitting inside it. Peterman admitted asking the woman if she would help him procure young girls with whom he could have sex, photograph the sex acts, and then sell the photographs on the Internet.

Peterman was formally charged with crimes related to this incident in Reno County case No. 01 CR 1122. After a three-day trial in November 2002, a jury convicted Peterman of attempted rape, solicitation to commit rape, and solicitation to commit

sexual exploitation of a child. As a result of these convictions, Peterman received a sentence of 144 months in prison and was required to register as a sex offender for the duration of his lifetime, pursuant to the Kansas Offender Registration Act (KORA), K.S.A. 2016 Supp. 22-4901 et seq. Those convictions were affirmed on appeal. See *State v. Peterman*, 280 Kan. 56, 118 P.3d 1267 (2005). Peterman was released in early 2013.

B. *KORA violation investigation*

On Thursday, January 30, 2014, Deputy Mitch Harris, then the KORA compliance officer in the Reno County Sheriff's Office, received an anonymous tip that Peterman was using an unregistered cellular telephone. As part of his KORA registration requirements, Peterman was required to register any phone numbers and websites he utilized. He was aware of this and signed documents indicating his understanding of these requirements.

Dep. Harris investigated by reviewing Reno County records, contacting Rice County (where Peterman worked and was also required under KORA to register in that county), and contacting Peterman's parole officer, none of whom were aware of the tipped phone number or of Peterman having registered it. Dep. Harris then went to Detective Diana Skomal, who had been on the force for approximately 24 years, to ask for assistance in his investigation; he believed she had additional resources and experience that could help him. Det. Skomal was unaware of the specific convictions and circumstances warranting Peterman's registration as a sex offender. Using a website that allowed for looking up a person by entering their telephone number, the tipped number came back registered to "Craig Childs."

Det. Skomal was acquainted with Childs and offered to call him at the number to either disprove the anonymous tip or to help confirm that Peterman was using an unregistered cell phone. When she called the number, Det. Skomal did not identify herself as a law enforcement officer but simply asked for Craig. The man on the other

3

end of the line said he was not Craig, told her that she had the wrong number, and they disconnected the call. Dep. Harris thought the voice sounded like Peterman's voice, but he was not sure.

Still needing to investigate the anonymous tip, Det. Skomal suggested she text the number to try to elicit the identity of the man on the other end. She wrote: "I'm so sorry to bother u again…I just called u looking for Craig. I don't wanna give u a big sob story but r u sure ur not him?? I'd hate to think I was given a bogus # for a hook-up."

While Det. Skomal suggested that she was trying to reach Craig for a hookup, Peterman responded and confirmed he was not Craig but offered, "I am not him but if ur looking for a hookup I might help u." In later texts, Det. Skomal provided the false name of "Lyn," and Peterman disclosed that his name was Steve. Det. Skomal wanted Peterman to send his picture to attempt to confirm who he was so the officers could confirm the KORA violation. Other text messages followed, which will be discussed below; however, it was when Peterman e-mailed a photograph of himself to Lyn the next day that Det. Skomal was able to provide that photo to Dep. Harris so he could conclude that the anonymous tip was correct and the unregistered cell phone number was in use by Peterman.

It was discovered throughout the course of this investigation that Peterman was also active on two social media/dating websites he failed to register as required and he had an e-mail address he had also failed to register.

C. *Electronic solicitation investigation*

Immediately after learning Det. Skomal's false screen name, Peterman asked "Lyn" how old she was and invited her to send him of photograph. Lyn deflected and asked him how old he wanted her to be. Peterman sent Lyn his e-mail address so she

4

could send him her picture. He also deflected disclosing his age, claiming to be an "ol country boy who loves to bullride" and then began using rodeo and bull riding euphemisms as sexual innuendo, e.g., "[I]f you want to play in my rodeo grounds" and "R u looking for a wild romp." Lyn wrote, "I don't know bout all that," and asked if he was on any social media or hook-up sites. He replied, "U wanna play or stay in the barn." Lyn wrote that she just didn't want to get burned, "Like lookin for Craig." He replied that since she still had not sent him a picture, it was "time to close the [barn] door." But, he then wrote, "I'm just an average looking guy but I guarantee I can put a smile on your face that will last a week" and asked her if she wanted him to "git [his] spurs on." He then demanded that she send him a picture or "get turned out to pasture."

Lyn replied, "Sorry I'm not very good at this. If I send u a pic u will know my age," to which Peterman replied, "U over 18." Lyn responded, "Well I can drive/But no not over 18."

Peterman threatened to disengage because he thought Lyn was playing games with him, so Lyn replied, "Ain't like I do this all the time. My bad. Have a nice day." Peterman reengaged at that point and said he just wanted to see who he was talking to. Lyn asked, "So if I sent you [a picture] u won't freak cuz my age?" and Peterman replied, "Why should i."

Later messages sent by Lyn demonstrated that she was under her mother's control, afraid of her, and had to wait for her to leave before she could send a picture to Peterman. Lyn began alluding to a dysfunctional, unhappy relationship with her mother. Peterman's replies took on a patient tone, expressing his understanding of Lyn's home life. He told Lyn that he wanted a picture of her whole body ("whole package"), not just her face, and he asked where her mother was going. Lyn disclosed more personal hardships about her relationship with her mother, including drug abuse, which Lyn considered a good thing because she could be free of her mother when her mother was high. Peterman asked Lyn

5

why she stayed with her mother, and Lyn replied that she didn't have anywhere else to go. He again deflected answering her question about his age: "Old enough."

Lyn sent Peterman her e-mail address, lynnygirl15@gmail.com, so he could send her his picture and then said she had to go; however, Peterman continued to engage and responded, "Where u off to." Lyn said she had to go get her mom to calm down, "She mad cuz I'm hotter than her & I got a life. lol." Peterman replied, "Maybe she needs laid lol" and "Maybe you need to let me be the judge of how hot you are." Peterman asked her if she was on a computer, and Lyn replied that she could get e-mail on her cell phone.

Peterman asked Lyn how well she knew Hutchinson, described where his house was consistent with the address in his KORA registration documentation, and suggested she come over; Lyn replied, "Ur house? What u got in mind?" to which Peterman replied, "U tell me." Lyn said, "U kno I'm not that way. I mean like being direct n all. U kinda need to take the lead . . . / I'm not experienced at all if ya know what I mean." Peterman then said, "Gotta go for now." Lyn asked, "Y?" Peterman still had not sent a picture.

After learning that Lyn was a virgin, Peterman's texts suggested he became apprehensive: He replied, "None at all / Why me . . . / For all i know could be a shady deal if u git my drift." Nevertheless, he immediately turned back to Lyn's home life: "R things that rough at home." After she replied that her home life "sucks," he replied, "U know where im at if ur out this weekend and want to ride / Well if you want to learn how to ride cowgirl style call me." Lyn asked what he was doing after school tomorrow, then said, "Geez sorry. Guess u don't have school I do, I'm a dork. But in the afternoon?" He replied that he'd be around his house and she could come over if she wanted to.

Peterman kept the exchange going and next asked Lyn, "U natural or smooth," to which she replied, "Smooth as silk"; he indicated his appreciation with a smiley face and asked her to prove it. She asked if he wanted proof in a picture or in person, and he

replied that he wanted it in person. When Peterman told Lyn to call him, she said she couldn't because her mother would take her phone if she caught Lyn texting.

The next day, Friday, January 31, 2014, Lyn texted Peterman to ask if he got her e-mailed picture. At this point, Det. Skomal still had not received Peterman's picture to establish the unregistered cell phone and KORA violation. Later that afternoon, Lyn texted Peterman that she just received his picture. He asked her what she thought of his picture and said that he got the one of her on the boat. Peterman asked her, "So whats up," and she replied that she was just ready to get out of school; he replied that he was "Ready to ride." She asked if they could meet somewhere other than his house because it was "kinda scary," and he replied, "R u looking for some experience / Or what / Come bring it on."

Lyn asked if he could pick her up because she didn't want to park her mom's car somewhere out of the ordinary, but she would "like to learn." He told her she could park at a business near his house and he would pick her up there; he said, "Can teach u" and asked, "U ever play with urself or rub it," to which Lyn replied, "Since I'm only 15 I don't have a reg license so I guess I could park there. Yes I got that part figured out." Peterman replied, "Who knows about this," and Lyn replied, "Nobody"; he said, "Keep it that way / Think you can handle it." She asked him to pick her up and said she could handle it if he's a good teacher; he asked if she was a fast learner and told her, "Give u all the [practice] u want long as u stay quiet n not brag bout it." In the texts immediately following, Lyn stated she thought she could meet him at 4:30 p.m. and he asked her how long she planned to stay; he told her she would need a "Couple hours for school."

Peterman then asked Lyn who gave her his number; she reminded him she had initially been looking for Craig; and he told her to call him. In the recorded telephone call, Peterman immediately asked Lyn if this was a setup. She replied, "[M]aybe it's a bad idea altogether." He said, "I don't need no trouble and neither do you . . . If you're

7

wanting to learn, that's one thing." They discussed where to meet and he gave her directions of how to walk to his house, stating, "I'm just being a little cautious, know what I mean?" to which Lyn replied, "I guess I don't." Lyn said that maybe they should forget it; she said that it was a mistake and an accident that she called him since she was looking for Craig and that Peterman was now treating her like she'd done something to him. He encouraged her to come over and asked if she was still going to be there by 4:30. Peterman said, "You're the student wanting to learn," but Lyn said she was "freaking out"; he attempted to turn her mind to their encounter, asking her what she wanted to learn. Lyn said she was worried it would hurt and was thinking it was scary, but she didn't want to be a tease. Peterman said that if she was willing to learn, he was willing to teach her, but that he didn't want any trouble or drama, and Lyn replied that she didn't either—she didn't want her mom finding out.

At this point in the telephone conversation, Peterman explained to her that they could both get into a lot of serious trouble because he was over 21 and she wasn't and he didn't need to go to jail for rape or anything like that. Lyn asked why it would be rape and Peterman told her that the "laws have changed so much." She asked, "Would I be in trouble?" to which he replied, "I don't want you to be, and I don't want to be neither." Lyn said she didn't understand because "I have a friend, Stacy, and she's having sex with a guy who's 22 and she's my age. She's 15. Are they breaking the law?" and he replied, "[Y]es and no. . . Let me ask you this:  is this gonna be a consensual thing? . . . All I'm asking you:  are you giving consent for sex?" Lyn expressed apprehension since he mentioned rape that he might not stop if she changed her mind and said no, to which Peterman replied, "I'm gonna let you take it at your own pace."

Approximately halfway through the phone call, Peterman told Lyn, "You sound a little older than 15," to which Lyn replied that she had to grow up a lot, she was looking to "get the rest figured out" so she could get out of her mom's house sooner; she explained that she was not much of a kid because she was "kind of serious" and told

8

Peterman, "[Y]ou're not the first person to say that." He replied by telling her that he was going to leave the decision up to her and, "If you wanna go for it, we'll go for it." Peterman never brought up Lyn's age again. For the next several minutes of the phone call, Peterman told Lyn that he wasn't trying to scold her or tell her she was doing anything wrong, and then he wanted her to tell him over the phone what she wanted him to do to her; he asked how "bashful" she was; Lyn said she didn't get the whole "sex thing" and said she's trying to figure it out, "I'm not going to be able to give you a mini-porno over the phone."

Peterman asked her again how much she was willing to learn, and she asked him if he had protection because she didn't want to get pregnant. He replied, "I don't think you're going to have to worry about that . . . I am very clean . . . I take my bull riding very serious . . . If this all works out and you want a place to stay at, you got one, okay?" She asked again if he had protection, stating that "they hammer us with that at school," and he said that it could be taken care of.

Peterman then told her he would help her relax by giving her a massage and asked if she had ever had an orgasm. He asked her again what kind of vehicle she would be driving and how soon she would be there. He reiterated that he wasn't looking for any trouble and didn't need the cops at his house. She said she didn't want any trouble either, but he was freaking her out. He asked her again how long she planned to stay, if she wanted to "go for this or not," and when she replied she would "head that way," Peterman said, "One other question for ya:  how tight are you?" Lyn responded that she assumed she was pretty tight because "I haven't had anything in there."

Peterman then said, "This is the way this is gonna go down, okay? When you get here, you tell me what you want to learn. If you think you wanna try to take it, we'll just let you be on top and you see what you can handle." Peterman told her that it would probably hurt a little bit "being that you've never done it before. But I think that if we get

9

you well lubricated I think you can probably take it." The rest of the conversation followed similarly with him telling her she would be in control, that he would teach her to use her senses, that it would take a couple of hours, and if she wanted to "skip the massage and get right down to business" he could do that, too. Lyn told him she'd be there in 20 minutes and they hung up.

Almost immediately after they hung up, Peterman texted Lyn and said that he thought something was wrong, to which she replied, "Shit dude ur freakin me out. Lets try latr." The balance of the exchange involved Lyn disengaging and Peterman trying to get her to come meet him:

> PETERMAN: "Ur ok come on / Its ok / Teacher is waiting / Will be there
>
> LYN: "I'll hit u up latr I gotta think
>
> PETERMAN: "Ok / Baby its like this if you want the experience I'm getting ready to walk out the door and head that way
>
> LYN: "Yeah but I'm freaked n scared. I need some time. Idk
>
> PETERMAN: "You'll be fine you'll be ok you ain't got nothing to be scared about or worried about okay
>
> LYN: "Ok … I think I'm gonna think a minute. U around this weekend??
>
> PETERMAN: "Just tonight new u werent serious but im waiting for u to show
>
> LYN: "I was serious… u weren't
>
> PETERMAN: "Yes i am / And got what you want
>
> LYN: "Like what? How's that work?
>
> PETERMAN: "Im willing so get over here / U cumming / Guess not."

Saturday evening, Peterman sent Lyn a single text that said, "Hey."

Over the next couple of days, the texting continued. Peterman never again expressed any apprehension about thinking it was a setup. The texts consisted of her being sorry if she made him mad at her, being in trouble for blowing curfew, and her excitement about a possible snow day from school and whether that would allow them to

get together. Peterman said that he still wanted to get together and asked if it had been "heavy on [her] mind," to which she replied, "Little bit yeah." Peterman asked, "Why / Who knows?" Lyn responded that no one knew and no one would know, but that it was on her mind because it was a big decision for her. He asked her if she still wanted to "do this" and told her he would be off of work the next weekend, if she could "handle this."

On Friday morning, February 7th, Peterman asked her to describe her vagina and wanted her to send him a picture of it. Lyn said she wanted to please him and learn the right way. He continued telling her it would take a few hours, and he asked if she wanted more than a one-time thing and if she was excited. Peterman told her not to be nervous and that they'd go slow so she wouldn't be hurt because he wanted her to enjoy it. He told her that her being a virgin was not a "turn off" and he would teach her things that would make her better than her girlfriends.

On Monday, February 10th, the exchange transferred from texting to a messaging format on a website called TWOO.com, which Peterman invited Lyn to join. For Lyn to register, she had to include her birthdate, but the drop down box would not let her choose a year to reflect an age under 18; the youngest year was 1995, which then showed her age as approximately 18 years and 1 month old. Her profile indicated that she was in secondary school, studying. Peterman and Lyn's exchanges on this website were consistent with their texts messages—he wanted to know if she was looking forward to her lessons; he was looking forward to teaching her; she vented about her mother and wanted to run away; and he told her several times she could stay with him, if she needed to.

The next afternoon, he initiated the messaging on TWOO.com by stating, "Hi do u think we can get this done this week. You were heavy on my mind last night." In these messages, Peterman wanted to confirm that she wanted to "get laid" and that she wanted to please him, and he wanted to know when they could get started. He asked her,

11

"[A]nybody know of this," to which she replied, "Hell no." He asked again for a picture of her vagina, but Lyn told him she couldn't send him one because her mother had been going through her things, and said, "Don't worry; been deleting all my messages." Peterman responded to not getting the picture by telling her he wasn't sure she really wanted to learn, to which she replied she just wanted to know what night worked for him; he said any night was fine and he just wanted to teach her. At this point, he began asking similarly explicit sexual questions as he had in some of his text messages regarding her virginity, her vagina, and telling her that he would teach her to have orgasms.

As part of this exchange, Peterman asked her if she had "puffy beaver lips" and "puffy pussy lips" and said he loved "it that way" because it would make it "easier" for her to "take him." He then told her that he couldn't wait to give her her first orgasm, and then he asked her to move in with him and told her it was a serious offer. He then asked her, "[W]hat size r ur boobs," and told her, "If u wanna live here come on. But no drama and it needs to be [kept] quiet ok. No one needs to know where ur at ok."

On Wednesday, February 12th, the exchange transferred back to text messages because Lyn said it was easier for her. Over the course of the morning, Peterman asked if she was planning to stay with him "for good" and to tell him when and where to pick her up at the mall in town. He told her he bought her some "sexy panties" and hoped that they would fit. He told her that she would "need to [keep] a very low profile for awhile too."

A couple of hours later, he again confirmed that she was moving in "for good" and asked her about missing school, to which she replied that it was covered because she forged a note from her mother. He asked if she was ready for her lessons and said, "[N]obody needs to know where you r." He suggested that she would have all the time she needed to learn since she would be with him during the days, too. Lyn wrote, "Hope u know that even tho I don't have sexual experience I'm more like a grownup than 15" because she knew how to cook and clean. Peterman asked if her mother would be looking

for her; Lyn said she wouldn't be and her mom wouldn't know where to look anyway. Lyn told Peterman that meeting would have to wait until after school because she couldn't get out of her last class. Throughout the afternoon, he asked her questions about her vagina and whether he had "permission to play on the playground." He told her there was no reason to be nervous, shy, or bashful and told her she could sleep naked.

When Lyn told Peterman that she was out of school and going to the mall, he told her to watch for his truck; he was over by the high school, so be watching for him to pull up so she could "hop in," and he offered to take her shopping later for matching bras and panties. Peterman told her to walk through the mall doors, she'd see his white truck and he'd pick her up.

Det. Skomal testified that her initial communications were only to identify whether Peterman had the unregistered cell phone; however the investigation changed in character when it was clear from his text messages that he was not concerned about how young Lyn was.

D. *Search warrant for truck*

At trial, Det. Skomal testified that Peterman was under surveillance from the time he left his house; he was immediately apprehended and arrested in the parking lot at the mall. Peterman's truck was impounded and taken to a police lot, pending the approval of a search warrant.

Det. Skomal testified that she believed Peterman communicated with Lyn via text messaging on a cellular telephone and through the Internet, possibly by computer. She did not know the specific device or devices he used and did not know what kind of storage medium he may have used, e.g., floppy disks, thumb drives, etc. When Det. Skomal wrote the affidavit in support of the search warrant for Peterman's truck, she

13

included the types of devices and storage options capable of recording and capturing text communications or Internet communications. The only thing in Peterman's truck that conformed to the items to be seized as described in the search warrant was Peterman's cellular telephone. The officers seized only the telephone.

E. *Interview*

After Peterman was arrested, he was Mirandized but waived his rights and agreed to talk with Dep. Harris and later Det. Skomal. Peterman told Dep. Harris, "I think I know what this is about; is it over that texting?" Dep. Harris said he was there to discuss KORA registration issues. After discussing Peterman's violations, with particular emphasis on the unregistered cellphone, Peterman admitted that he had been using the cellphone for three or four months and that he failed to register the phone in Reno County, as required. He said that the only dating site he'd been on was Meet24, but later he admitted to being on TWOO for approximately two weeks. Dep. Harris asked Peterman if there was anything on those sites he was "ashamed of" and wanted to disclose before he checked up on the sites; Peterman then admitted he was going to the mall to meet a girl who sometimes said she was 15 and sometimes said she was 18. Peterman admitted that he'd had talked with this girl about having sex and moving in to his house: "It's nothin' downright dirty or anything like that." He claimed he went to the mall to see if the girl was 15 or 18, and if she was 15, he "wanted nothing to do with her." Peterman stated that even after Lyn told him she was 15, he still had contact with her, but it was she who always initiated contact with him.

Det. Skomal entered the interview and after several minutes revealed herself to be Lyn; she told Peterman that she knew he wasn't being honest regarding the text messages because they were all in her phone, too. Det. Skomal stated:

SKOMAL: "You were going to have Lyn move in with you.

14

PETERMAN: "I told her she could.

SKOMAL: "You sure did.

PETERMAN: "I told her that there would be people, you know, that I would help her.

SKOMAL: "You also told her you were going to teach her to have sex.

PETERMAN: "Yep, I did.

SKOMAL: "You did. And you wanted to know how tight she was.

PETERMAN: "Yep.

SKOMAL: "And you wanted her to send you a picture of her vagina.

PETERMAN: "Yep.

SKOMAL: "And you knew that she was under 18 when you asked her that.

PETERMAN: "I questioned it. I really did.

SKOMAL: "I told you twice I was 15. I told you again today I was 15.

PETERMAN: "Well, you don't look 15 to me."

He later admitted that he went to the mall to take Lyn home with him and teach her how to have sex and that he had brand new panties in his dresser drawer at home. Peterman said he was "just curious." When Det. Skomal asked Peterman to explain why he wanted Lyn to keep quiet because he didn't want to get in trouble for rape if he didn't believe she was 15, Peterman said, "I didn't know whether she was 15 or not," and that the main thing he learned from this was to be "a whole lot more cautious." Peterman said, "I thought [having sex] was a possibility, but I didn't think it was gonna happen. I just figured it was too damn good to be true."

F. *Trial and disposition*

The instructions the district court gave to the jurors included information about their duty to consider and weigh all of the evidence presented and to follow all instructions, that it was for the jurors to determine the weight and credibility of witness testimony, that they had a right to use their common knowledge and experiences in making those determinations, that it was the State's burden to prove Peterman's guilt, that they were to presume him not guilty unless convinced otherwise beyond a reasonable

15

doubt, and that their verdict must be unanimous and founded entirely upon admitted evidence and the law in the instructions. Instructions as to the count of electronic solicitation of a child were given, as was an instruction given on Peterman's affirmative defense of entrapment. A separate instruction was given on the KORA violation.

The jury returned a verdict of guilty on both counts.

Peterman was sentenced on March 20, 2015. His criminal history score was determined to be an A. His did not object to his score. He was sentenced to the standard prison term of 233 months for his conviction on Count I, electronic solicitation of a child. He was sentenced to the standard 18 months for his conviction on Count II, violating KORA, which was to run concurrent with his sentence on Count I. Peterman has timely appealed.

ANALYSIS

For convenience, we take up the issues on appeal in an order different from the parties' briefing. We add facts as necessary.

*Denial of Motion to Suppress*

Peterman filed a pretrial motion to suppress evidence obtained from his cell phone on the grounds the search warrant and the supporting affidavit were overbroad and lacked sufficient particularity. He contends the search of the cell phone and the seizure of the messages from it were unreasonable and, therefore, violated the Fourth Amendment to the United States Constitution. Even assuming the search warrant or the affidavit were defective, any error would have been harmless and did not affect the trial and the jury's consideration of the charges for the simple reason the State introduced none of the information obtained from Peterman's cell phone as evidence against him. All of the

16

messages were the versions Det. Skomal sent, received, and stored on her electronic devices. The messages bore on the electronic solicitation charge.

As to the failure to register charge, the State had to show Peterman used a telephone number he had failed to report as required under KORA. The State did so without any messages taken from the cell phone itself. And the evidence established Peterman's use of the telephone number without the seizure of the cell phone. In speaking with Dep. Harris and Det. Skomal, Peterson admitted his use of an unregistered telephone.

Moreover, even assuming a Fourth Amendment violation and an erroneous ruling in the district court on the motion to suppress, the appropriate remedy for the constitutional violation would have been the exclusion of any impermissibly seized evidence from Peterman's jury trial. *United States v. Leon*, 468 U.S. 897, 908-09, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) ("The Court has, to be sure, not seriously questioned, 'in the absence of a more efficacious sanction, the continued application of the [exclusionary] rule to suppress evidence from the case where a Fourth Amendment violation has been substantial and deliberate.'"). As we have said, Peterman can point to no evidence admitted at trial he asserts was unconstitutionally seized. In turn, he cannot show his right to a fair trial was compromised. Without that showing, Peterman demonstrates no prejudicial error or harm. We have been presented with no grounds for reversing the convictions based on an ostensible violation of the Fourth Amendment. See *State v. Miller*, No. 109,716, 2015 WL 3632029, at *3 (Kan. App. 2015) (unpublished opinion), *rev. denied* January 25, 2016.

*Admission of Peterman's Past Convictions for Sex Crimes*

Peterman contends that the district court did not explicitly admit the evidence of his prior sex crimes convictions under K.S.A. 2016 Supp. 60-455(d) to allow the State to

17

demonstrate his propensity to commit sex-related crimes involving solicitation of underage females; rather, the evidence was allowed only to show intent, motive, or absence of mistake. He also claims that a limiting instruction to the jury, although not requested by the defense, was required of the district court. Finally, he points out the district court made no express finding that the probative value of Peterman's earlier convictions and their circumstances outweighed any unduly prejudicial effect.

An appellate court must apply the statutory law on evidence as it was at the time of the challenged evidentiary ruling, i.e., at the time of trial. *State v. Page*, 303 Kan. 548, 551, 363 P.3d 391 (2015). When the question of whether the trial court complied with specific statutory requirements for admitting evidence requires interpretation of the statute, appellate review is de novo. See *State v. Stafford*, 296 Kan. 25, 47, 290 P.3d 562 (2012).

At the time of Peterman's trial in March 2015, the statutory law on evidence pertinent to the challenged ruling regarding the State's introduction of Peterman's prior sex crimes convictions was as it is in K.S.A. 2016 Supp. 60-455(d), which states:

> "Except as provided in K.S.A. 60-445, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense under articles 34, 35 or 36 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or articles 54, 55 or 56 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 2016 Supp. 21-6104, 21-6325, 21-6326 or 21-6419 through 21-6422, and amendments thereto, evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative."

Count I of the complaint fell under chapter 21, article 55 for electronic solicitation of a child, per K.S.A. 2016 Supp. 21-5509(a), (b)(1). This makes evidence of Peterman's prior acts or offenses of sexual misconduct admissible and allows the consideration of that evidence for its bearing on "any matter to which it is relevant and probative."

18

Appellate review of a trial court's decision to admit evidence is a two-step process. First, the appellate court determines whether the evidence is relevant. *State v. Phillips*, 295 Kan. 929, 947, 287 P.3d 245 (2012). Evidence is relevant if it has a "tendency in reason to prove any material fact." K.S.A. 60-401(b). A material or logical connection between the asserted facts and the inference or result they are intended to establish demonstrates "relevance." 295 Kan. 929, Syl. ¶ 7. Relevant evidence is both: (1) material, i.e., the fact has a legitimate and effective bearing on the decision of the case and is in dispute; and (2) probative, i.e., it has "'any tendency in reason to prove'" the fact. *State v. Boleyn*, 297 Kan. 610, 622, 303 P.3d 680 (2013). Materiality is reviewed de novo, while probativeness is reviewed for abuse of discretion. 297 Kan. at 622.

If the evidence is relevant, the court next applies the statutory provisions governing admission and exclusion of evidence. *Phillips*, 295 Kan. at 947. "These rules are applied either as a matter of law or in the exercise of the district court's discretion, depending on the rule in question." *State v. Hughes*, 286 Kan. 1010, 1020, 191 P.3d 268 (2008). Whether the probative value of otherwise relevant evidence outweighs its potential for undue prejudice is reviewed for abuse of discretion. See *Phillips*, 295 Kan. at 947; *State v. Wilson*, 295 Kan. 605, 621, 289 P.3d 1082 (2012).

A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. *State v. Huddleston*, 298 Kan. 941, 960, 318 P.3d 140 (2014). But "[w]hen the adequacy of the *legal* basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo." *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006).

Although the district court did not directly rely on K.S.A. 2016 Supp. 60-455(d) to admit the past convictions, we may consider whether that provision furnished a sufficient statutory basis for doing so. *State v. Garcia-Barron*, 50 Kan. App. 2d 500, 507, 329 P.3d 1247 (2014) (district court may be affirmed if it reaches correct result for the wrong reason). That would be an additional reason for admitting the convictions. Because Peterman relied on an entrapment defense at trial to the electronic solicitation charge, the district court properly considered the past convictions under K.S.A. 2016 Supp. 60-455(b) to rebut that defense. To counter a claim of entrapment, the State may show the defendant had a "predisposition" to commit the charged crime—here soliciting a person believed to be a minor for illicit sexual purposes. See *State v. Nelson*, 249 Kan. 689, Syl. ¶ 4, 822 P.2d 53 (1991) ("A person who is predisposed to commit a particular crime cannot claim entrapment."); *State v. Ralston*, 43 Kan. App. 2d 353, 366, 225 P.3d 741 (2010) (entrapment defense may be "rebutted by evidence of an intent and predisposition" to commit the crime). There may be some theoretical difference between evidence of propensity admissible under K.S.A. 2016 Supp. 60-455(d) and evidence of predisposition admissible under K.S.A. 2016 Supp. 60-455(b) in an entrapment case. But any difference would be miniscule as a practical matter. A previous conviction for a crime comparable to the charged crime is a recognized way of proving predisposition and, thus, rebutting any claimed entrapment. See *State v. Amodei*, 222 Kan. 140, 142-43, 563 P.2d 440 (1977); *United States v. Mayfield*, 771 F.3d 417, 437-38 (7th Cir. 2014); *State v. Bratton*, No. 99,521, 2009 WL 4639504, at *6 (Kan. App. 2009) (unpublished opinion).

In sex offense cases, propensity evidence has a "'legitimate and effective bearing'" on a defendant's guilt, i.e., it is material. *State v. Bowen*, 299 Kan. 339, 349, 323 P.3d 853 (2014); see also *State v. Remmert*, 298 Kan. 621, 627-28, 316 P.3d 154 (2014) (prior diversion for sex crime against young girl relevant to guilt in prosecution for sex crime against young boy); *State v. Spear*, 297 Kan. 780, 789, 304 P.3d 1246 (2013) (victim's prior molestation allegations against defendant would have been admissible propensity

20

evidence in later prosecution for aggravated indecent liberties involving same victim); *State v. Prine*, 297 Kan. 460, 480, 303 P.3d 662 (2013) (defendant's prior sexual abuse of daughter and younger sister admissible propensity evidence in prosecution for sexual abuse against friend's daughter). In this case, the evidence of Peterman's past convictions was probative of his propensity to commit the acts alleged by the State because the prior crimes were sufficiently similar to those acts. Those crimes and the charged crime here both entailed a disposition or propensity to engage in sex with minor females and extended efforts to seek them out for that purpose.

Peterman made no request for a limiting instruction, and he would not have been entitled to one regarding propensity evidence admissible under K.S.A. 2016 Supp. 60-455(d). *State v. Breeden*, 297 Kan. 567, 577-78, 304 P.3d 660 (2013). Even assuming a limiting instruction should have been given regarding the jury's consideration of Peterman's previous convictions as they bore on his entrapment defense, review here would be for clear error, since there was no request for an instruction in the district court. K.S.A. 2016 Supp. 22-3414(3); *State v. Brammer*, 301 Kan. 333, 339, 343 P.3d 75 (2015). The Kansas Supreme Court has phrased the clearly erroneous standard as "whether [the appellate court] is firmly convinced that the jury would have reached a different verdict had the instructional error not occurred." *State v. Williams*, 295 Kan. 506, Syl. ¶ 5, 286 P.3d 195 (2012). Given the wealth of evidence against Peterman, including his own inculpatory statements to law enforcement officers, and the otherwise proper admission of his past convictions as propensity evidence without a limiting instruction, we readily conclude the omission of an instruction about their use to prove predisposition made no difference.

Finally, Peterman claims that past convictions for sex crimes was more unfairly prejudicial than probative because the evidence distracted the jury from the central issues. He suggests the material facts of the 2001 crimes were dissimilar to electronic solicitation charge in this case. Peterman also points out the district court never made an explicit

21

finding on probative value versus undue prejudice. As we have already indicated, the prior crimes were quite similar to the electronic solicitation crime in the key respects reflecting a common propensity and predisposition. The very aspects of the earlier convictions making them prejudicial—the sordid intent, disposition, and propensity animating them—also made them highly probative. That does not amount to *unfair* prejudice requiring they be excluded as evidence.

Ultimately, the district court carefully regulated the admission of the previous crimes evidence in front of the jury in a way that minimized the danger of unfair prejudice. The district court allowed the State to admit a documentary exhibit of joint stipulations as to the underlying facts of the 2001 case. The presentation of this evidence was not time consuming, as it was admitted at trial as a written stipulation read into the record by the district court. The evidence, then, was quickly and surgically admitted without extended testimony from multiple witnesses.

The district court's lack of an explicit finding balancing the probative value of the past convictions against their undue prejudice created no meaningful error. The district court knew about the requirement and had deferred a formal ruling on the point. Although the district court never revisited the issue to make a formal ruling, its handling of the evidence, including the use of a stipulation to present it to the jury, necessarily entailed a finding favoring probative value. Peterman never asked for a specific ruling from the district court.

The question before us now is whether the district court would have abused its discretion in making an explicit finding that the probative value of Peterman's past convictions outweighed any unfair prejudice. We, of course, know what that evidence was, since it was admitted through the stipulation. Given those facts and the governing law, we can fairly conclude there was no abuse of discretion in admitting the evidence.

That is, a reasonable district court judge would have acted within the broad range of judicial discretion in admitting the convictions and the stipulation in this case.

Peterman has shown no error on this point.

*Jury Instructions on Entrapment*

For the first time on appeal, Peterman challenges the jury instructions related to his entrapment defense in two respects. Because the points were not presented to the district court for consideration during the trial, we review them using the standard for clear error we have already outlined.

First, Peterman says the district court should have used PIK Crim. 4th 51.050 (2013 Supp.) to explain to the jurors how they should have considered the evidence on entrapment. In a case with an entrapment defense, PIK Crim. 4th 51.050 would state: "The defendant raises entrapment as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant." The district court presumably should have included PIK Crim. 4th 51.050 among the instructions given the jury in this case. But the Kansas Supreme Court has consistently held the failure to use the instruction does not rise to the level of clear error. *State v. Staten*, 304 Kan. 957, 964-67, 377 P.3d 427 (2016); *State v. Cooperwood*, 282 Kan. 572, 580-82, 147 P.3d 125 (2006); *State v. Crabtree*, 248 Kan. 33, 40-41, 805 P.2d 1 (1991). We, of course, are obligated to apply that authority and, therefore, find Peterman's point to be without merit.

For his other challenge to the instructions, Peterman asserts what the district court told the jurors didn't convey an adequate meaning of "predisposition," thereby leaving them to deliberate without a clear understanding of what the State had to show to rebut

23

his entrapment defense. The district court used what is now PIK Crim. 4th 52.110 (2016 Supp.) to inform the jurors about the defense. As tailored for this case, the instruction stated:

> "Entrapment is a defense if Steven Peterman was induced or persuaded by a public officer to commit a crime which Steven Peterman had no previous disposition, intention, plan or purpose to commit. Entrapment is not a defense if Steven Peterman originated, began or conceived the plan to commit the crime or when he had shown a predisposition, a plan, an intention or a purpose for committing the crime and was merely afforded an opportunity to consummate or carry out his intention to complete his plan to commit the crime and was assisted by the public officer. Steven Peterman cannot rely on the defense of entrapment if the conduct of electronic solicitation of a child was likely to occur in the course of Steven Peterman's usual activities and the public officer did not mislead Steven Peterman into believing his conduct was lawful."

The instruction contains a concise rendition of the law governing entrapment. It explains that the defense would apply if Peterman "had no previous disposition" to commit the crime but would not if he "had shown a predisposition . . . and . . . was merely afforded an opportunity" to solicit a person he believed to be a minor. Conceptually, neither "disposition" nor "predisposition" depends upon some unusual legal meaning in explaining entrapment. The words are common English ones, and their customary definitions apply here. We have no reason to think jurors would be confused by them or misunderstand them. During their deliberations, the jurors did not ask for some clarification or additional guidance in their consideration of the instruction or the entrapment defense.

In short, we are unpersuaded PIK Crim. 4th 52.110 is erroneous, let alone clearly erroneous.

24

Peterman has failed to show reversible error based on the jury instructions related to his entrapment defense.

*Sufficiency of the Evidence Negating Entrapment*

The State has the burden to negate an affirmative defense, such as entrapment, by proof beyond a reasonable doubt. K.S.A. 2016 Supp. 21-5108(c); *Staten*, 304 Kan. at 966-67 (applying 21-5108[c] to self-defense). Peterman argues the State failed to do so in this case and specifically points to a lack of evidence he was predisposed to engage in electronic solicitation of a minor. In reviewing a sufficiency challenge, we construe the evidence in a light most favorable to the party prevailing below, here the State, and in support of the jury's verdict. An appellate court will neither reweigh the evidence generally nor make credibility determinations specifically. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006). The issue for review is simply whether rational jurors could have found the defendant guilty beyond a reasonable doubt. *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014).

To be found guilty of electronic solicitation of a child, the State was required to prove beyond a reasonable doubt that Peterman communicated by telephone, Internet, or other electronic means to entice or solicit a person whom he believed to be a child of more than 14 but less than 16 years of age to commit or submit to an unlawful sexual act. K.S.A. 2016 Supp. 21-5509(a), (b)(1). Entrapment, as a defense to a criminal charge, rests on the policy notion that government entities and their agents should not foment unlawful conduct. See *Jacobson v. United States*, 503 U.S. 540, 553-54, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992). So if a government agent induces a person not otherwise disposed toward criminal behavior to break the law, the ostensible lawbreaker should not be held to answer for the wrongful act. The defense, however, does not apply when the agent merely affords an opportunity to someone already inclined to commit the crime.

25

See K.S.A. 2016 Supp. 21-5208(a); *State v. Jones*, 271 Kan. 201, 204, 21 P.3d 569 (2001) (discussing circumstances supporting entrapment defense); *State v. Jordan*, 220 Kan. 110, 116, 551 P.2d 773 (1976) (same).

Without rehashing the facts, we readily conclude there was ample evidence to support the jury's determination Det. Skomal did not induce Peterman to commit a crime he otherwise lacked a predisposition to commit. Although "Lyn" first contacted Peterman, the extended discussions between them by electronic means and telephone over the course of days do not portray a man recoiling at the possibility of engaging in a sexual encounter with an underage female. To the contrary, the discussions show Peterman repeatedly encouraging and enticing Lyn to meet him for precisely such a purpose. Although Peterman minimized his conduct while talking with law enforcement offices by expressing some doubt about Lyn's age, the evidence shows that Lyn stated several times that she was 15 years old and various details of her persona were consistent with her being a minor. The communications themselves permitted a reasonable jury to conclude Lyn did not coax or cajole an otherwise resistant Peterman to commit a crime. As this court recently observed: "Entrapment shields the reluctant-though-impressionable delinquent but not the criminally minded opportunist." *State v. Brooks*, No. 113,636, 2017 WL 839793, at *3 (Kan. App. 2017) (unpublished opinion), *rev. denied* 306 Kan. ___ (August 30, 2017).

Moreover, of course, the jury properly considered Peterman's past convictions for sex crimes in determining his predisposition here. That evidence substantially undercuts a claim of entrapment and lack of predisposition. Although those crimes took place in 2001, Peterman was in prison until about a year before the crime charged here took place. So a jury could conclude Peterman rather quickly seized an opportunity to act on his predisposition.

At best, Peterman's argument on sufficiency of the evidence really invites us to reweigh the evidence and to come to a conclusion different from the jury's. But that would be inconsistent with the governing standard of review. See *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). Viewed in the correct light, the evidence was sufficient to defuse Peterman's entrapment defense and to support his conviction for electronic solicitation of a child.

*Conclusion*

We have carefully considered the issues Peterman has raised and the State's responses to them. As our discussion indicates, Peterman has understandably focused on his conviction for electronic solicitation. Given the record on appeal, we have been presented with no grounds requiring reversal of Peterman's convictions for violating KORA and for electronic solicitation of a child.

Affirmed.