IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,131

STATE OF KANSAS,
*Appellee*,

v.

CECIL MEGGERSON,
*Appellant*.

SYLLABUS BY THE COURT

1.

Issues not properly briefed are waived or abandoned.

2.

A litigant who alleges error bears the burden of designating a sufficient record on appeal to show error.

3.

A person trained in the use and maintenance of a jail telephone system and its records is qualified to lay sufficient foundation testimony for that system.

4.

If a district court properly admitted evidence under one enumerated exception listed in K.S.A. 2019 Supp. 60-455(b), appellate courts need not address the efficacy of another enumerated exception.

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed October 23, 2020. Affirmed.

*Jeffrey C. Leiker*, of Leiker Law Office P.A., of Kansas City, argued the cause and was on the brief for appellant.

*Daniel G. Obermeier*, assistant district attorney, argued the cause, and *Ethan Zipf-Sigler*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: After a string of violent robberies in Kansas City, Missouri, and Kansas City, Kansas, Cecil Meggerson and Dyron King were jointly tried. The jury convicted Meggerson of attempted capital murder of Deputy Scott Wood, aggravated robbery of Patricia Pope, aggravated robbery of Deputy Scott Wood, aggravated robbery of Daniel Bayer, aggravated battery of Deputy Scott Wood, aggravated battery of Daniel Bayer, conspiracy to commit aggravated robbery, criminal possession of a weapon by a convicted felon on March 3, 2015, and criminal possession of a weapon by a convicted felon on March 4, 2015. The jury acquitted Meggerson on charges of aggravated robbery of Reginald Jones. The district court imposed a hard 25 sentence and a consecutive term of 449 months with the Department of Corrections. Meggerson directly appealed.

FACTS AND PROCEDURAL BACKGROUND

We previously decided King's appeal in *State v. King*, 308 Kan. 16, 417 P.3d 1073 (2018). In that decision, we described the key events as follows:

2

"Don's Market and Liquors robbery

"On the evening of February 27, 2015, three men wearing black clothing and brandishing guns entered Don's Market and Liquors at 3000 Southwest Boulevard, Kansas City, Missouri. The cashier noticed one of the men was armed with a revolver and another carried a semiautomatic handgun with 'a longer magazine.' The man with the revolver—wearing a white mask and a pair of black and white gloves—came around the counter and demanded money. The cashier emptied the cash from the register into a plastic sack. The robbers then demanded the cashier's wallet, but when he was unable to locate it, he was pushed to the ground. The robbers left with the plastic sack, various types of liquor, cartons of cigarettes, and lottery tickets.

"The store's surveillance cameras showed the man with the white mask was also wearing black and white batting gloves and gray 'boot style' shoes. Another robber was carrying a 'MAC-11 style' semiautomatic gun with an extended magazine. This suspect wore a mask and Nike shoes with a distinctive yellow or white toe pattern. The third robber was wearing all black and carrying a revolver with a wood handle. Surveillance video from a nearby business showed the three suspects exit the store and get in a black four-door sedan with no front license plate.

"Family Dollar robbery

"Around 8:45 p.m. on March 3, 2015, Patricia Pope was working as a cashier at the Family Dollar located at 1225 Quindaro, Kansas City, Kansas. Reginald Jones was a customer in the store at the time. Pope was restocking the shelves when she noticed Jones make his way to the front register to pay for his items. As she walked to the front to help Jones, a taller man with a handgun came through the front door wearing black clothing, a mask, and gloves. The suspect approached Jones and pointed the gun at him. While this was occurring, two other individuals who were wearing dark clothing entered the store.

"The taller suspect spoke to Jones, but Pope could not make out what was said. He then struck Jones in the forehead with the handgun, and Jones fell to the ground, bleeding heavily. While on the ground, Jones was told to give up his keys and billfold.

3

Jones tossed them his keys and said to take his car. But the robbers eventually left the store without taking the keys.

"After striking Jones, the taller suspect grabbed Pope and pushed her toward the counter. Once behind the counter, the man used a tool to pry open the cash register. He emptied the contents of the drawer into a store trash can and then repeated the same process at another cash register.

"While the taller man was prying open the drawers, another robber shoved Pope to the ground near the store's safe, demanding she open it. When Pope said she could not open it, the man fired two shots near her, one hitting the ground by her leg. Pope repeated that she was unable to open the safe, so he fired a third shot over her shoulder next to her face. The robbers left the store with the contents of the cash registers and some Newport cigarettes from behind the counter.

"Pope noticed the taller suspect had on blue 'workman's boots or workman's shoes.' Pope told a responding officer she could tell all three suspects were black males, but she later testified at trial that she could not discern their race. The store's surveillance video revealed one of the men was wearing a hoodie with a large gold eagle on the back. Another suspect wore black and white gloves and had a MAC-style semiautomatic handgun with an extended magazine. All three suspects had a firearm, one of which was a revolver with a wood handle. In addition to the surveillance video, investigators recovered two shell casings and a bullet from the store.

"Shamrock robbery

"Shortly after 10 p.m. on March 3, 2015, three armed men dressed in black robbed a Shamrock gas station at 8505 Woodland Avenue in Kansas City, Missouri. Brenden Foxworthy and Dustin Paquet were working the evening shift. Both Foxworthy and Paquet described one of the robbers as taller than the others. The taller robber, who was wearing a black mask covering his entire face, ordered Foxworthy to open the registers and safe. Foxworthy opened the registers, but when he was unable to open the safe, he was struck several times on top of his head with a gun. Foxworthy fell to the ground where he remained until the suspects left.

4

"Paquet observed one of the suspects was carrying a handgun with an extended magazine. All three robbers concealed their faces with either a mask, scarf, or hoodie. At some point before Foxworthy was struck, a shot was fired. After the suspects had left the store, Foxworthy heard shots being fired in the parking lot.

"Surveillance footage showed the tallest robber was wearing all black clothing and wielding a semiautomatic handgun with an extended magazine. He was wearing black and white batting gloves and a gray boot style shoe. The second suspect was dressed in all black and wore a mask with a University of Missouri Tiger's logo. He had on two-tone gray gloves and was carrying a revolver with a wood handle. The last suspect wore a black hoodie with a distinctive gold eagle design on the back and a pair of gloves with a faded yellow logo. He also wore Nike shoes with a unique yellow and white toe pattern.

"Foxworthy and Paquet told officers that the suspects took money and bottles of Patron. Video surveillance showed the robbers also took bottles of Rémy Martin, 1800 Tequila, and other bottles of tequila. Officers recovered several bullet shell casings from the parking lot.

"Kicks 66 robbery

"Around 12:45 a.m. on March 4, 2015, three masked men robbed a Kicks 66 gas station at the corner of 79th Street and Wornall Road in Kansas City, Missouri. Dannella Villa, the general manager, was training Derrick Brining that night. Villa saw three armed men dressed in dark clothing with their faces covered run through the front door. All three men were armed with handguns. Villa noticed one of the men had a mask with some sort of design. She described the height of the robbers as 'one tall, one medium, and one short.'

"When they entered the store, Villa and Brining dropped to the ground, and Villa pressed the store's panic button. The tallest suspect and the medium-height suspect approached Villa and demanded money. One of the men came around the counter, and the other jumped over while firing gunshots. After opening one of the cash registers,

5

Villa tried to open another but struggled to do so. The medium-height suspect used his pistol to hit her twice on the top of her head and once on her face. While striking Villa, he said, 'I'm gonna kill you, bitch.' Villa fell to the ground, acting as though she was unconscious.

"While they were behind the counter, the robbers tried to intimidate Villa and Brining by firing several shots near them. The robbers also tried to get Brining to open the safe, but because it was his first night on the job, he did not know how. Brining was struck several times with the butt of a gun. The robbers fired gunshots at the safe, trying to open it, and one of the bullets ricocheted off of the safe and struck Brining in the knuckle. They eventually abandoned their attempt to shoot open the safe, opting to ransack the store before leaving with the money from the registers.

"Villa saw enough of the tall and medium robbers' skin to discern they were black. The store's video surveillance cameras showed one of the robbers wore a distinctive gray boot style shoe and was wearing black and white Easton batting gloves. Another robber was carrying a revolver with a wood handle, had on two-toned black and gray gloves, and was wearing a mask with a University of Missouri logo. The third robber was wearing a jacket with a gold eagle emblem on the back.

"While entering the store, one of the suspects used a section of picket fence to prop open the door. Officers later discovered the section of fence was taken from a privacy fence located behind the gas station. While examining the fence behind the store, officers discovered a pack of Newport cigarettes and a knotted section of black t-shirt. Officers also recovered numerous bullet fragments and empty shell casings from the gas station.

"7-Eleven robbery

"The final robbery occurred at the 7-Eleven convenience store located at 4331 Shawnee Drive in Kansas City, Kansas. In the early morning hours of March 4, 2015, Dan Bayer was the only person working the overnight shift. Around 1 a.m., Officer Scott Wood with the Wyandotte County Sheriff's Office came into the store. Officer Wood had

just finished his work shift and stopped at the gas station on his way home. He was still in uniform and wearing his gun. After selecting some items, Officer Wood went to the checkout counter, where he struck up a conversation with Bayer.

"The robbery began as the two were leaning on the counter and talking—Bayer facing the front door and Officer Wood facing away from the door. Three armed men dressed in black and wearing masks entered the store. They held their guns in the air, announced it was a robbery, and ordered Officer Wood to lie down on the ground. Bayer observed one of assailants was 'noticeably taller' than the others. Before Officer Wood went to the ground, he was able to catch a glimpse of the men. He also described one of the men as 'a bit stockier than the other two and a little bit taller.'

"One of the men came over the counter, grabbed Bayer's arm, and hit him in the head. Another suspect came around the counter while the other positioned himself over Officer Wood. The men ordered Bayer to open the cash register, and after he had done so, they had Bayer place the money in a bag. Bayer was then ordered to hand over his wallet, but when the suspects discovered there was no money in it, they returned it to Bayer. Bayer was then ordered to withdraw money from the store's safe. Bayer withdrew $60 and gave it to them. Two of the suspects wrestled the drawer out of the second register.

"As two of the robbers dealt with Bayer, Officer Wood was lying on his stomach with his hands spread out in front of him. The third suspect held a knee to his back and told him that if he moved or tried anything, they would shoot and kill him. The man patted him down. Officer Wood tried to conceal his gun with his jacket, but to no avail; the suspect discovered the gun and tried to wrestle it from the holster. Unable to free the gun, the robber became frustrated and hit Officer Wood in the back of his head with an object, causing Officer Wood to bleed. The holster strap eventually broke, and the suspect removed the gun. He also took Officer Wood's knife and wallet, which contained cash.

"At this point, multiple gunshots were fired. Bayer could not tell which suspect fired the shots. Officer Wood later testified he could tell based on his training that a

7

revolver and a semiautomatic handgun were being fired at the same time. Officer Wood first felt a pain in his jaw, and his mouth began to fill up with blood. He then felt pain in his right shoulder, left chest, and left abdomen.

"Once the suspects fled the store, Officer Wood—who had remained conscious—radioed dispatch to report that he had been shot. Shortly thereafter, he lost consciousness. The treating trauma surgeon later testified that Officer Wood suffered gunshot wounds to his jaw, left and right shoulders, left chest, and right side of his neck. Officer Wood survived and testified at trial. His gun was later recovered in Clay County, Missouri.

"The store's video surveillance revealed the shooter used a revolver with a wood handle. One of the robbers wore black and white Easton batting gloves; another wore dark gloves with a gold band; and the last suspect had on two-toned gloves. One robber wore gray boot style shoes.

"Investigation

"The initial lead came from Kansas City, Missouri, police officers who were able to lift a fingerprint from the pack of Newport cigarettes recovered from behind the Kicks 66. The print belonged to a young black male, Dyron King. Also located on the box of cigarettes was a State of Kansas tax stamp that was affixed by a distribution company. A detective working with the distribution company was able to determine from a code on the stamp that the box was distributed to a group of vendors in the Kansas City, Kansas, area, which included the Family Dollar located at 1225 Quindaro.

"Shortly after discovering the fingerprint, an investigator obtained the GPS location of King's cell phone. That evening, Kansas City, Kansas, and Kansas City, Missouri, officers—as well as various tactical response teams—arrived at 838 North 83rd Terrace in Kansas City, Kansas. When they knocked on the front door, King's mother answered, and one of the officers saw King in the front room of the home. Shortly thereafter, officers discovered two other young black males—Charles Bowser and Cecil Meggerson—in the home. All three were arrested.

"Officers obtained a search warrant for the home. In King's downstairs bedroom, officers located three handguns, including a .357 magnum revolver on the bed. The revolver had a wood handle with a gold emblem. Behind a ceiling tile, officers found a bag containing a large amount of cash resting next to a MAC-style gun with an extended magazine. Resting on the floor were empty coin wrappers; a pair of blue and gray Nike boot style shoes, one with a drop of blood on it; an 'improvised mask' that looked to be made from the sleeve of a t-shirt with a University of Missouri logo on it; and various liquor bottles, including Patron and Rémy Martin. A black hoodie, black pants, and a black jacket were also recovered from the bedroom.

"Also in King's bedroom were the keys to a black Lincoln sedan that was parked in front of the house. Officers later learned the car belonged to Bowser. Inside the vehicle, officers recovered a pair of black and white Easton batting gloves; a pair of black gloves with a yellow stripe; a pair of two-toned gloves; a pair of black gloves; a bottle of Rémy Martin; a box of .357 bullets; and another 'impromptu mask' that appeared to be made from a t-shirt.

"Officers obtained a warrant to search Bowser's residence in Kansas City, Missouri. There they found a bottle of Patron in a dresser that also contained mail addressed to Bowser. Officers also located a coin wrapper behind a couch and a shirt matching the description of a shirt worn in the robbery of Don's Market and Liquors.

"When officers booked Meggerson into jail, they took into evidence the clothing he was wearing, which included a pair of black Nike Air Max shoes. They also collected Meggerson's Nokia cellphone, which contained four photographs of Meggerson holding a bottle of Patron and a bottle of 1800 Tequila. The timestamps on the photos indicated they were taken at 11:50 p.m. on March 3, 2015.

"Meggerson's cell phone contained text messages between him and 'Dyron.' One of the messages stated, 'I need them 357,' which was sent on March 4. A detective testified that he believed '357' referred to the .357 magnum revolver that was recovered from King's bedroom. Another text message from Dyron on February 28 stated, 'Don't

9

take it yet. We about to get money. Then we take it when we get a good L.' The phone's call log indicated Dyron called Meggerson's phone three times on March 3, 2015.

"In addition to Meggerson's phone, officers collected an LG cell phone from the living room floor at 838 North 83rd Terrace, and yet another cell phone was collected, though the record is unclear where it was found. An FBI special agent was able to determine one of the phones connected to the cellphone tower nearest the Family Dollar at 8:39 p.m. on March 3, 2015. The Family Dollar robbery occurred around 8:45 p.m. that day. The same agent also determined Meggerson's phone connected to the two cell phone towers nearest the Shamrock 10 times between 9:53 p.m. and 9:59 p.m. The Shamrock robbery occurred shortly after 10 p.m.

"After listening to jailhouse phone calls made by Meggerson, officers obtained a warrant to search his girlfriend's apartment. There they found a shoebox containing a wallet with Meggerson's identification. Also in the shoebox were several items such as earrings, necklaces, and sunglasses with the price tags still attached.

"During the course of the investigation, detectives obtained a DNA search warrant for all three suspects. DNA analysis from blood found on two spots from inside and outside the black and white Easton batting gloves revealed a mixture of a major and minor contributors. King was found to be the major contributor to both. Among three contributors to the DNA found inside the black and gray gloves found in the sedan, Meggerson's DNA was determined to be the major contributor. Of the four contributors to the DNA found in the black and yellow gloves, Bowser was the major contributor. Bowser was found to be the major contributor to three stains found on the University of Missouri mask. And Bowser was the major DNA contributor to the knotted fabric found behind the Kicks 66 gas station. King was found to be the major contributor of DNA located inside the blue and gray Nike boot style shoe. The blood found on the exterior of the shoe belonged to Foxworthy.

"Swabbings from the revolver found in King's room revealed blood in one of the cylinder pin housings. The major DNA profile matched that of Officer Wood's to the probability of 1 in 520 octillion individuals. A firearms examiner compared shell casings

10

recovered from the 7-Eleven, Family Dollar, and Shamrock robberies and was able to determine they were all fired from the same gun.

"Investigators recovered footprints from the Kicks 66 gas station which were left behind on a 5-hour Energy box and a folded piece of paper. A forensic specialist determined the impression on the 5-hour Energy box could have been made by the blue and gray Nike boot style shoe recovered from King's bedroom. The same specialist deduced the black Nike Air Max shoes recovered from Meggerson could have made the impression on the folded piece of paper.

"While King was incarcerated at the Wyandotte County jail awaiting trial, he made statements to two different detention officers. On one occasion, a detention officer told King he could not leave his cell during a health and welfare check because the facility was on lockdown. King became agitated and started yelling at the officer, calling him a liar. When the detention officer told King there was nothing he could do about it, the officer walked to another cell. The officer testified he could still hear King tell another inmate, 'I know that bitch is just lying to try and mess with me and he's pissed off that I shot one of his buddies and now he wants to get his.'

"Officer Jonathan Cortes testified about the second statement, which allegedly occurred over an intercom system used by officers and inmates to communicate with each other. King demanded access to a phone so he could speak with a sergeant. According to Officer Cortes, when he denied the requests, King yelled over the intercom that 'he gets the phone and the sergeant . . . whenever he want[s] to because he shot a policeman and that [the officers] fear[ ] him.' Officer Cortes claimed over the next two hours, King repeated multiple times that the officer was just mad because King 'shot [his] boy.' Officer Cortes also testified King said 'he was gonna beat [his] ass and shoot [him].'

"Procedural posture

"The State charged King, Meggerson, and Bowser with attempted capital murder of Officer Wood, aggravated robbery of Patricia Pope (Family Dollar cashier); aggravated robbery of Reginald Jones (Family Dollar customer); aggravated robbery of Dan Bayer (7-Eleven clerk); aggravated robbery of Officer Wood; aggravated battery of

11

Officer Wood; aggravated battery of Dan Bayer; conspiracy to commit aggravated robbery; and two counts of criminal possession of a firearm. King was also charged with criminal threat toward Officer Cortes.

"On December 9, 2015, King and Meggerson filed a joint motion to sever their trial from Bowser's. The motion stated the attorneys for King and Meggerson had received statements from two individuals who were incarcerated with Bowser. The statements allegedly indicated Bowser confessed to these individuals and explained in detail how the crimes were committed. However, before the court could consider the motion, Bowser received new counsel on January 8, 2016. At the pretrial motions hearing on January 15, 2016, Bowser's new counsel asked the court for a 'continuance,' explaining that he had been assigned to the case one week earlier and noting the large amount of discovery he had to review. The State did not object, and the court granted the request, telling Bowser's attorney that they would have to set a new hearing and trial date. Neither King nor Meggerson moved to sever their joint trial.

"Ten days later, the court began a two-week jury trial of both King and Meggerson. The State called 74 witnesses and offered over 600 exhibits. The surveillance videos of each robbery were entered into evidence and viewed by the jury. Neither defendant presented evidence. The jury found King guilty as charged except for the aggravated robbery of Jones and the criminal threat to Officer Cortes. The jury also found Meggerson guilty as charged except for the aggravated robbery of Jones." 308 Kan. at 17-27.

DISCUSSION

*The State presented sufficient evidence to convict Meggerson.*

Meggerson first claims his convictions are not supported by sufficient evidence. Meggerson titles this argument this way: "There is insufficient evidence to support Mr. Meggerson's felony convictions, specifically for the felonies of Attempted Capital

12

Murder, three counts of Robbery, two counts of Aggravated Battery, conspiracy to commit Aggravated Robbery, and two counts of Criminal Possession of a Firearm." The body of the argument, however, only discusses the attempted capital murder conviction.

Issues not briefed or not adequately briefed are deemed waived or abandoned. *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019); *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). A point raised incidentally in a brief but not argued is also deemed abandoned. *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018). Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *Salary*, 309 Kan. at 481. We hold that Meggerson has waived each sufficiency claim, save for the claim related to his attempted capital murder conviction.

Attacking his attempted capital murder conviction, Meggerson argues no direct evidence implicated him because the police followed a cigarette pack with King's fingerprint. Meggerson claims he and King are cousins, so his presence at King's home was pure coincidence. Meggerson points to Officer Dion Dundovich, who Meggerson claims testified "Meggerson was arrested with King and Bowser simply because he was the third black man in the house, and for no other reason." He continues that the search of King's home yielded evidence implicating King and Bowser, but nothing implicating Meggerson. He adds that the search of his girlfriend's apartment likewise did not provide incriminating evidence. Further, Meggerson argues the State failed to prove premeditation, and without evidence of premeditation, insufficient evidence existed for the jury to convict Meggerson of the offense of attempted capital murder.

When a defendant attacks the sufficiency of the evidence used to convict him or her, we must ask "'whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Chandler*, 307 Kan. 657, 668,

13

414 P.3d 713 (2018). We are not to "'reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" 307 Kan. at 668. This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict. *State v. Torres*, 308 Kan. 476, 488, 421 P.3d 733 (2018); *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

The record is replete with direct and circumstantial evidence implicating Meggerson in the 7-Eleven robbery. Further, the State properly used witness testimony about the other robberies to show plan and identity for Meggerson, King, and Bowser.

Each robbery was committed in substantially the same manner. Cell phone data established Meggerson's cell phone was at the regional cell phone tower nearest the Shamrock gas station nine times during the course of that robbery. Meggerson, King, and Bowser texted and called each other during the robberies. Meggerson texted King and requested a ".357"—the same caliber as the revolver recovered from King's home and as the one used to shoot Deputy Wood. Further, Meggerson texted "[w]e about to get money." Meggerson's DNA matched DNA recovered from the Hyflex brand glove recovered from Bowser's Lincoln LS found in King's driveway. The Kicks 66 and 7-Eleven video surveillance footage depicted an individual wearing Hyflex brand gloves. Similarly, Meggerson wore Nike Air Max shoes when police arrested him. In the Kicks 66 and 7-Eleven surveillance videos, the individual wearing Hyflex gloves also wore Nike Air Max shoes. The treads of the Nike Air Max shoes found at the Kicks 66 and 7-Eleven locations were consistent with one another.

At trial, the jury was instructed on accomplice liability. Jury Instruction No. 94 instructed the jury that "[a] person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime." The record implicated the three as codefendants—police recovered black and white Easton brand batting gloves,

14

visible on surveillance video at each robbery location, from Bowser's Lincoln LS and King's was the major contributing DNA profile on that pair of gloves. Additionally, a black sedan consistent with Bowser's black Lincoln LS is visible on the Don's Market and Liquors surveillance video.

Police found a cloth face mask containing Bowser's DNA in the Lincoln. This face mask is visible in several robbery videos and is identifiable by a logo on the cloth. The face mask was located near the Easton and Hyflex brand gloves. The chamber of the revolver recovered from King's bedroom contained Deputy Wood's blood. This revolver was a .357—the same caliber discussed by Meggerson over text messages and the same caliber as the gun used to shoot Deputy Wood. King's DNA was inside a pair of gray Nike boots that contained a Shamrock station employee's blood. Similar boots can be seen on multiple surveillance videos.

A knotted shirt used as a face mask was discovered outside the Kicks 66 location and contained Bowser's DNA. Police found a Newport cigarette package nearby. The cigarettes were consistent with the cigarettes sold at and taken from the Family Dollar store. Meggerson instructed his girlfriend, Ashley Carvin, to sell or dispose of the "packs" in a jail phone call.

We are thoroughly convinced the record contains sufficient evidence such that a reasonable juror would conclude that Meggerson committed attempted capital murder based on the substantial body of evidence presented at trial. There was no error.

*Meggerson failed to designate a sufficient record to support his claim of error concerning his cell phone.*

Next, Meggerson asserts the district court erred when it admitted the contents of his cell phone. He explains that a "piggyback" warrant was used by a Clay County, Missouri crime lab for his phone recovered in Wyandotte County, Kansas. Meggerson notes that a probable cause affidavit was provided to a Missouri judge for the phone search warrant, but the information in the affidavit went only to the search of King's home and vehicle. More or less, Meggerson claims the Missouri search warrant was deficient and a "virtual rubber-stamp." Meggerson concludes the phone's contents were highly prejudicial, containing photographs of Meggerson holding liquor bottles similar to those taken from several of the robberies.

Before trial, Meggerson moved to quash the search warrant for King's residence and to suppress any obtained evidence. The warrant application included four recovered cell phones. Meggerson received a hearing and argued the original Missouri warrant did not provide probable cause to search the phone. He claimed Detective David Foster contradicted himself—that Foster originally testified he forgot to include a probable cause statement, but later testified he provided the proper probable cause statements with the affidavit. The district court stated that all the correct information was included and denied Meggerson's motion.

On appeal, however, Meggerson failed to include in the record on appeal the allegedly defective warrant, its underlying affidavits or probable cause statements, or any relevant materials. Meggerson, as the party claiming error, has the burden to designate a record affirmatively showing prejudicial error. Without such a record, we must presume the actions of the district court were proper. *State v. Simmons*, 307 Kan. 38, 43, 405 P.3d 1190 (2017); see also *State v. Miller*, 308 Kan. 1119, 1157, 427 P.3d 907 (2018) ("The burden is on the party making a claim of error to designate facts in the record to support

16

that claim; without such a record, the claim of error fails."). Because Meggerson failed to fulfill his burden to provide the documents necessary for our consideration, his claim fails.

*The district court properly admitted Meggerson's jail phone calls.*

Meggerson next complains the district court erred when it admitted his Wyandotte County jail phone calls—specifically the admission of his statement to Carvin: ". . . hey, do you remember what I have Caprice (ph)? You know, those—the two packs, get rid of them. You know them things I like, get rid of them or get a discount on them. Get some money off of them." Meggerson admits the "packs" reference cigarettes and claims the statement implied to the jury he destroyed evidence. Meggerson complains the State did not actually play the phone calls to the jury, but detectives who listened to them described the calls. He asserts this was an end-run around the appropriate process for the admission of audio file evidence. Meggerson argues this prejudiced his case because the State used this phone call in closing argument to suggest Carvin moved or destroyed evidence at Meggerson's request, which is why a search of Meggerson's apartment yielded little evidence.

At trial, Detective Troy Rice testified the jail Pay-Tel phone system indicated the number Meggerson dialed belonged to Meggerson's girlfriend, Carvin. Meggerson objected, claiming Rice was not the records custodian for the phone system, so his testimony was hearsay. Meggerson argued the State needed a records custodian to lay foundation for the Pay-Tel phone system. The district court disagreed and permitted the State to question Detective Rice if he heard the conversation and what Rice did next based on that information without getting into the conversation's contents.

Meggerson essentially makes two claims:  (1) Carvin was not properly identified on the call; and (2) the Pay-Tel jail phone server was maintained elsewhere and required the testimony of a records custodian to lay sufficient foundation. We will address each.

Meggerson first claims the State failed to sufficiently identify Carvin on the phone calls. We conclude otherwise. Detective Rice testified the Pay-Tel system identified the number Meggerson called as Carvin's. He testified "the phone number on record with the Wyandotte County's Pay-Tel phone system to that number, was an Ashley Carvin." When pressed further, Detective Rice explained if a "phone number has been registered before in the system, there is some data fields, which fills in not only the phone number, but the name and address of the person to that phone number from prior records."

Later, the record custodian for the phone system, Detective Sherry Anderson-Simpson, testified that Carvin's information was previously entered into the Pay-Tel system. She stated that she listened to "a phone call that was made on March 5th at about 14:48 hours . . . to Ashl[e]y Carvin from Cecil Meggerson." In light of this testimony, we are satisfied the evidence was sufficient to connect Carvin to the call.

Meggerson's second argument asserts Detective Anderson-Simpson was not the proper records custodian. While we have not directly addressed this question, the Court of Appeals has consistently permitted police detectives, captains, or other police personnel to provide foundation for their jail phone systems.

In *State v. Ross*, No. 118,199, 2019 WL 847672, at *7 (Kan. App. 2019) (unpublished opinion), the Court of Appeals permitted the jail support commander to testify as a rebuttal witness and "explain[] the process for searching the phone system for a specific inmate's phone calls." Many other examples exist. See *State v. Leaper*, 40 Kan. App. 2d 902, 910, 196 P.3d 949 (2009), *aff'd* 291 Kan. 89, 238 P3d 266 (2010); *State v. Andrews*, 39 Kan. App. 2d 19, 20-21, 176 P.3d 245 (2008); *State v. Kurtenbach*, No.

18

119,845, 2019 WL 490519, at *1 (Kan. App. 2019) (unpublished opinion); *State v. Loewen*, No. 102,577, 2010 WL 1078477, at *1 (Kan. App. 2010) (unpublished opinion);.

We agree with the Court of Appeals and hold under these facts, Detective Anderson-Simpson properly laid foundation for the jail phone call. The record shows Detective Anderson-Simpson was a Wyandotte County Sheriff's Office employee during Meggerson's incarceration. She detailed the jail used a "web based system with a secure user name and password" and described the process an inmate uses to place or receive a phone call, including a "unique pin number" assigned to each inmate. Detective Anderson-Simpson also testified that she acted as the Pay-Tel phone system custodian, ensured the system functioned properly, checked phone calls for abuse, and reported misuse of the system. Further, Detective Anderson-Simpson noted that Pay-Tel provided training to her and other staff on the system's operation. She learned "how to use the system, how to block numbers from the system, how to make certain phone numbers not recorded, and basically . . . how we could find when inmates are using other pin numbers to make phone calls." Detective Anderson-Simpson described hers as a "very thorough training."

We are convinced Detective Anderson-Simpson laid a proper foundation for the Pay-Tel phone record.

*The district court properly admitted K.S.A. 2019 Supp. 60-455 prior crimes evidence.*

Meggerson next takes issue with K.S.A. 2019 Supp. 60-455 evidence admitted at trial. He explains the State admitted prior bad acts evidence about the other uncharged robberies to prove plan and identity but complains the evidence was not relevant for those purposes. What is more, Meggerson argues the State used the other robbery evidence for the sole purpose of showing propensity and highlights that this evidence consisted of

19

more than half of the State's case and thus the probative value did not outweigh its prejudicial effect. Meggerson admits the "identity of the perpetrator and plan were both material and in dispute." As such, we must decide first whether the evidence of these other robberies was relevant to prove the material facts of identity and plan, and second, whether the probative value of the evidence outweighed any prejudicial effect. *State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018).

All relevant evidence is admissible unless prohibited by statute, constitutional provision, or judicial decision. See K.S.A. 60-407(f); *Nauheim v. City of Topeka*, 309 Kan. 145, 153, 432 P.3d 647 (2019). When reviewing prior crimes evidence admitted under K.S.A. 2019 Supp. 60-455, we review a district court's relevance determination under a bifurcated standard of review. Relevance has two elements: materiality and probativeness. See *Miller*, 308 Kan. at 1167. Evidence is material when the fact it supports is in dispute or in issue in the case, and materiality is reviewed de novo. 308 Kan. at 1166-67. Evidence is probative if it has any tendency to prove any material fact, which we review for an abuse of discretion. 308 Kan. at 1166-67.

But a district court may exclude relevant evidence it when its probative value is outweighed by its potential for producing undue prejudice. See K.S.A. 2019 Supp. 60-455. We review the lower court's balancing of probative value against prejudicial effect for an abuse of discretion. *Haygood*, 308 Kan. at 1392-93. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). When prior crime evidence is provided under K.S.A. 2019 Supp. 60-455, the district court must provide a limiting instruction. *Haygood*, 308 Kan. at 1392-93.

While K.S.A. 2019 Supp. 60-455(a) prevents the use of propensity evidence in a criminal trial such as this one, it permits introduction of evidence of prior acts if it is being used for a legitimate, non-propensity reason:

"[S]uch evidence is admissible when relevant to prove *some other material fact* including motive, opportunity, *intent, preparation, plan*, knowledge, *identity* or absence of mistake or accident." (Emphases added.) K.S.A. 2019 Supp. 60-455(b).

Of note, the jury received the correct limiting instruction and Meggerson does not challenge the jury instruction, only the admission of the evidence. The limiting Jury Instruction No. 97 informed the jury: "Evidence has been admitted tending to prove that the defendant Cecil Meggerson committed crimes other than the present crimes charged. This evidence may be considered solely for the purpose of proving the defendant's motive, intent, plan, and identity."

K.S.A. 60-401(a)-(b) defines evidence and relevant evidence. "Evidence" is defined as "the means from which inferences may be drawn as a basis of proof in duly constituted judicial or fact-finding tribunals" and "relevant evidence" is any "evidence having *any tendency* in reason to prove any material fact." (Emphasis added.)

We previously discussed relevant evidence in a similar case. In *State v. Wilson*, 295 Kan. 605, 614-20, 289 P.3d 1082 (2012), we held seven uncharged burglaries from Kansas and Nebraska were relevant to prove identity and plan. Like Meggerson, Wilson agreed identity and plan were both material and in dispute but claimed "the uncharged burglaries were irrelevant to prove those disputed material facts." 295 Kan. at 616. There, we asked whether "the evidence was . . . probative of the disputed material facts and" therefore relevant. 295 Kan. at 618. We explained when K.S.A. 2019 Supp. 60-455 evidence is used to prove identity, "'the evidence should disclose sufficient facts and circumstances of the offense to raise a reasonable inference that the defendant committed

21

both offenses.'" 295 Kan. at 618 (quoting *State v. Higgenbotham*, 271 Kan. 582, Syl. ¶ 3, 23 P.3d 874 [2001]).

Then, we noted the commonalities between several burglaries, including (1) rural locations; (2) isolated houses with no near or adjacent neighbors; (3) each home was near a highway; (4) the area was limited to north-central Kansas and south-central Nebraska; (5) each home was unoccupied at the time of the burglaries; (6) each burglary was committed at approximately the same time; (7) Wilson was away from his own home when each burglary occurred; (8) firearms were left out at several locations; (9) cigarette butts were discovered at various homes; and (10) items of value were taken at each location. 295 Kan. at 619.

We summarized this evidence showed "the manner in which [the five charged] burglaries were committed—particularly evidence of the locations of the crimes and general time frame of the crimes, and evidence that stolen items from these homes were recovered in [the defendant's] home or RV" and that this raised "a reasonable inference that the same person . . . committed those burglaries." 295 Kan. at 619-20. Ultimately, we held the district court did not abuse its discretion when it found evidence from "the seven uncharged burglaries met the probativity element of relevance to prove the disputed material fact of identity." 295 Kan. at 620. Turning to plan, we explained because the evidence was permissible to prove K.S.A. 60-455's enumerated identity exception, there was no need to "consider [the defendant's] argument that the evidence was inadmissible to prove plan." 295 Kan. at 620.

In today's case, the K.S.A. 2019 Supp. 60-455 evidence "'disclose[s] sufficient facts and circumstances of the offense to raise a reasonable inference that [Meggerson] committed'" the previous robberies and the 7-Eleven robbery. See *Wilson*, 295 Kan. at 618. Witness testimony established the individuals perpetrated each robbery in substantially the same manner. Video surveillance depicted the same masks, gloves,

shoes, and handguns used in each crime. Bowser's black Lincoln was used as a getaway car in several robberies. Newport cigarettes were taken from many of the locations. Most of the robberies occurred within the same 24-hour time period in a small geographic area in Kansas City, Kansas, and Kansas City, Missouri.

These similarities closely reflect those discussed in *Wilson*, including the time of the robberies, their locations, the perpetrators' behavior during the crimes, and the items taken. We believe the record clearly indicates that the robberies provided a sufficient basis "'to raise a reasonable inference that [Meggerson] committed'" each crime and prove identity. See 295 Kan. at 618. We hold the district court did not abuse its discretion when it determined the robbery evidence was relevant to prove Meggerson's identity. Having affirmed the district court's admission of the K.S.A. 2019 Supp. 60-455 prior crimes evidence for identity, we need not discuss its efficacy to prove plan. See 295 Kan. at 620.

Moving to the final inquiry—whether the probative value of the prior crimes evidence outweighs the prejudicial effect—we again find *Wilson* highly instructive. Wilson classified the evidence connecting the uncharged burglaries to his case as "'minimal at best'" and therefore unduly prejudicial due to the large quantity of uncharged criminal cases. 295 Kan. at 621. We disagreed and preferred the State's framing "that identity 'was the most hotly contested issue of the trial.'" 295 Kan. at 621. We elaborated the uncharged burglaries provided "significant probative value to that issue" and noted the jury received a proper limiting instruction. 295 Kan. at 621. We held the district court did not abuse its discretion when it determined the probative value of the prior crimes evidence of seven uncharged crimes was not outweighed by the potential for undue prejudice. 295 Kan. at 621.

*Wilson* is directly analogous to Meggerson's case. First, the jury here also received a proper limiting instruction. See 295 Kan. at 621. Second, in *Wilson* the State also

23

presented a substantial amount of prior crimes evidence detailing seven uncharged burglaries. See 295 Kan. at 621. In our view, the K.S.A. 2019 Supp. 60-455 evidence presented here was highly probative, as it linked Newport cigarettes to each robbery, as well as the strategy and methodology of the robberies, the suspect's clothing, vehicle, revolver and other handguns, the limited geographic scope, and a timeframe.

Meggerson protests that the evidence became overly prejudicial when the State presented over half its case as K.S.A. 2019 Supp. 60-455 evidence. We decline to draw such a bright line. Meggerson fails to explain how the K.S.A. 2019 Supp. 60-455 evidence unduly prejudiced him, he simply assumes it did so because it exceeded 50% of the State's case. Meggerson provides no citation that suggests this court's analysis depends on the mathematical quantity or proportion of prior crimes evidence. K.S.A. 2019 Supp. 60-455(a)'s plain language does not indicate any tipping point for when evidence strays from appropriate to unduly prejudicial based purely upon the quantity of that evidence. See K.S.A. 2019 Supp. 60-455(a). If this were the measurement for prejudice, this court would have excluded the copious K.S.A. 2019 Supp. 60-455 evidence in *Wilson*. See 295 Kan. at 621. Without contrary authority, Meggerson's claim fails. See *Miller*, 308 Kan. at 1157; *Simmons*, 307 Kan. at 43.

*The district court properly admitted two timelines as evidence.*

Meggerson next challenges the district court's admission of two timelines as evidence. He claims the district court abused its discretion when it permitted Officer Dennis McMillin and Detective Todd Taylor to present demonstrative timelines because the timelines were repetitive and cumulative, contrary to *State v. Baker*, 255 Kan. 680, 691, 877 P.2d 946 (1994).

24

Officer McMillin provided an aid for the jury that compiled picture evidence, videos, and admitted exhibits in a chronological timeline. The timeline was admitted into evidence over Meggerson's objection. Meggerson analogized McMillin's timeline to an officer's report and claimed the jury could not use this tool, but must draw upon its collective memories. Detective Taylor prepared a timeline from comparison photographs he took during his investigation and photographs already in evidence. Again, Meggerson objected, claiming that the timeline should only be permitted as a demonstrative aid. The district court permitted the timeline as an exhibit. On appeal, Meggerson simply advances the argument that these timelines were cumulative and should have been excluded on that basis alone.

District courts have discretion to admit or exclude cumulative evidence. *State v. Reed*, 282 Kan. 272, 280, 144 P.3d 677 (2006). "[O]nly an abuse of that discretion warrants reversal on appeal." *State v. Hanson*, No. 98,793, 2008 WL 4849344, at *2 (Kan. App. 2008) (unpublished opinion). "'Cumulative evidence is evidence of the same kind to the same point, and whether it is cumulative is to be determined from its kind and character, rather than its effect.'" *State v. Dupree*, 304 Kan. 43, 65, 371 P.3d 862 (2016).

In *Dupree*, Dupree argued the district court abused its discretion after it admitted four crime scene photographs. He claimed "that the coroner did not even need to reference some of the photographs." 304 Kan. at 64-65. We noted a detective testified the photographs were an attempt to recreate a panoramic view of the kitchen where the victim was shot. Moreover, the photos had a corroborative effect on several key witnesses' accounts "about the circumstances of [the victim's] murder." 304 Kan. at 65. We explained we rarely "found an abuse of discretion in the admission of photographic evidence in a murder trial." 304 Kan. at 65 (finding no abuse of discretion).

*Dupree* is in good company, as we have refused to find an abuse of discretion for the admission of similar evidence. See, e.g., *State v. Mireles*, 297 Kan. 339, 356, 301 P.3d 677 (2013) (finding no abuse of discretion for admitting two photographs of the same wound because one showed the wound close up and the other depicted where the wound was on the victim's body); *State v. Rodriguez*, 295 Kan. 1146, 1158, 289 P.3d 85 (2012) (finding no abuse of discretion for admitting four photographs of a victim's autopsy because each provided additional context the others did not and showed injuries at different angles); *Reed*, 282 Kan. at 282 (holding the district court did not abuse its discretion for the admission of a taped 911 call in addition to the dispatcher's testimony because the tape corroborated the dispatcher's testimony and captured the suspect's demeanor during the crime); *State v. Hickles*, 261 Kan. 74, 88, 929 P.2d 141 (1996) (permitting over 100 photographs to be shown to the jury because, "Cumulative evidence in itself is not objectionable. Error cannot be predicated on allowing the use of such evidence."); *State v. Johnson*, 231 Kan. 151, 156-57, 643 P.2d 146 (1982) (no abuse of discretion for admitting testimony from two officers about certain windows).

Officer McMillin's timeline focused on all the physical evidence. He created a chronological account of the robberies to aid in the State's attempt to show plan and identity. Detective Taylor's timeline depicted metadata and reconstructed the recovered cell phones' locations during crucial events. These timelines are not "to the same point," and so we hold the timelines were not cumulative and the district court did not abuse its discretion when it admitted them. See *Dupree*, 304 Kan. at 65; *Rodriguez*, 295 Kan. at 1158.

*Cumulative error did not deny Meggerson a fair trial.*

Finally, Meggerson asserts cumulative error denied him a fair trial. We found no error during Meggerson's trial, so the cumulative error doctrine does not apply. *State v.*

*Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015); see also *State v. Blansett*, 309 Kan. 401, 402, 435 P.3d 1136 (2019) (explaining that under the cumulative error doctrine, the court must identify "multiple errors to accumulate").

Affirmed.

BEIER, J., not participating.[1]
PATRICK D. MCANANY, Senior Judge, assigned.[2]

---

[1]**REPORTER'S NOTE:**  Justice Beier heard oral arguments but did not participate in the final decision in case No.117,131. Justice Beier retired effective September 18, 2020.

[2]**REPORTER'S NOTE:**  Senior Judge McAnany was appointed to hear case No. 117,131 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.