IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,717

STATE OF KANSAS,
*Appellee*,

v.

KRISTOFFER L. KLESATH,
*Appellant.*

SYLLABUS BY THE COURT

1.
Specific intent to permanently deprive a person of their property is not an element of aggravated robbery.

2.
Self-defense cannot negate aggravated robbery, as the crime of aggravated robbery has no element that could justify the use of force in defense of oneself or another.

3.
A defendant may not assert self-defense if the defendant is attempting to commit, committing, or escaping from the commission of a forcible felony.

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Oral argument held December 13, 2023. Opinion filed January 12, 2024. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

1

*Carolyn A. Smith*, assistant district attorney, argued the cause, and *Michael Kagay*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Kristoffer Klesath directly appeals his convictions of first-degree felony murder, intentional second-degree murder, and aggravated robbery. He argues the State presented insufficient evidence to support the predicate felony of aggravated robbery, and the trial court erred by refusing to instruct the jury on reckless second-degree murder and failing to sua sponte instruct on involuntary manslaughter and its accompanying imperfect self-defense. We affirm.

We hold the evidence was sufficient to support aggravated robbery, and thus felony murder. And based on this, we need not consider his remaining challenges because the trial court merged his convictions for second-degree murder and felony murder, sentencing Klesath only on felony murder.

FACTUAL AND PROCEDURAL BACKGROUND

Darton Fields was outside a liquor store, along with Xavian Locke and Kendall Young, when Klesath came running past. Klesath slowed down and stopped, walking back with his arm out to Fields.

Both Fields and Klesath carried handguns. The pair grappled briefly, and Fields reached his hand towards his waistband. Klesath responded by pointing his gun at Fields. Klesath fired a shot, and Fields fell. Klesath fired two more shots and started to run away. At some point during the struggle, Fields' gun dropped to the ground. Klesath briefly

2

returned to pick it up before fleeing the scene. Fields died after being struck by two of three shots fired at him.

The State charged Klesath with first-degree felony murder with the predicate felony of aggravated robbery, intentional second-degree murder, and criminal possession of a weapon. He pled guilty to criminal possession of a weapon prior to trial.

Klesath testified in his own defense. He explained he was running to the store because it started raining, and stopped as he passed the group because "that's when [Fields] said he would shoot me." He described the scene:

> "I knew he was serious. I just went for my gun. Right then he was actually lifting his shirt up to grab his gun. When I took the step, I grabbed his arm and I was kind of shocked. I just grabbed his arm. I didn't even want to let go, honestly. He had his gun, but it was under the shirt. So it was wrapped under it."

He then heard Fields tell the group: "'Get him. Get him. Get his ass.'" While they were grappling, Klesath said he saw Fields swing around, so he shot twice. He stated:

> "I just—I really shot to stop him. And that was my first mind. So when I shot him and I saw that it hit him and he was going down, that was really letting me know that it was done. That's—there wasn't no, you know, try to stand over him or anything like that as it was depicted. I was still holding onto him. It just really kind of got to me, okay, let go, you know."

Klesath testified he fired the third shot because he was scared. He did not know Fields' gun had fallen off his body. He felt he was in danger and just needed to stop Fields. He explained, "I wasn't stopping and trying to make sure that I got him a certain way or that I stood there and made sure he didn't make it or anything like that."

3

But his trial testimony that he did not intend to kill Fields contradicted his prior testimony at another hearing. There, he testified he intended to kill Fields. When asked about the discrepancy at trial, Klesath explained he had been nervous about testifying and was not thinking about describing what happened—he should have said yes "a little lighter" than he did and "stop[ped] to try to explain like now."

To support his claim that he acted in self-defense, Klesath described his negative history with Fields before the shooting. They met when Klesath was 16 through his cousin Romeo Armstead. Later, in a seemingly unconnected event, Klesath and his then-girlfriend were shot in 2018 while driving in Topeka. At the time, Klesath did not know who was responsible, and law enforcement never identified a suspect. He believed Fields may have been responsible but said nothing to the police because "I was just kind of scared." At trial, he emphasized he typically does not contact police.

Then, about a month before the killing, when Klesath had gone to Fields' home to discuss problems between Fields and Armstead, Fields said he was the one who shot Klesath, saying "it was an accident, but that it could be on purpose." Klesath perceived that as a threat because Fields had a gun in his lap when they talked.

About two weeks later, Klesath had another run in with Fields. Klesath testified he was going to the liquor store and Fields walked past. They locked eyes and stared at each other. Fields passed and said "he would catch [Klesath] slipping."

Then, a week before the shooting, Klesath went to the liquor store with his mother, and Fields was sitting outside. Klesath did not want to go in because Fields was there. He sat in the car, while his mom walked over to Fields. Klesath described the interaction:

4

"She had like a look like this on her face. And I just got out. And I went and said something to him. I said, hey, leave my mom out of this. Don't say nothing to my mom, you know, and he just stared at me real long. He didn't say nothing to me, you know."

A liquor store employee came to unlock the store's door, and Klesath entered with his mom, ending the encounter.

Armstead testified at trial in support of Klesath's history with Fields stating, "I know they had got into an argument and some words and all that before." But he could not recall if Klesath ever told him Fields was responsible for the 2018 shooting.

Consistent with his testimony about their negative history, Klesath made several recorded phone calls from jail that were admitted into evidence. On one, he said a witness "qualified the incident as a robbery, but he felt it was more of a simple altercation." Later that same day, on a different call, he said "he got tired of worrying about whether or not that man was going to shoot him, but he exchanged one problem for another." Finally, on another day, Klesath was recorded, saying "he had seen this man a thousand times and had seen him at the liquor store before and wasn't trying to get into it with him."

Turning back to what happened the night of Fields' death, Locke and Young gave conflicting trial testimony. Locke said he did not see the shooting or the brief interaction between Fields and Klesath just before the shooting. He testified Fields and Klesath exchanged words, but he did not hear "what exact words were said." This differed from what he told police the night of the shooting—"it sounded like normal mug shit." He told the police he heard "the shooter say give me it," which he also testified to at a preliminary hearing. In response to this inconsistent testimony, Locke explained "this isn't exactly what I said though, but I—maybe somebody said just give me the shit." But then, Locke

5

retreated from that statement, saying "the only thing I can tell you I heard is maybe just the gunshots, but that's about it."

Young's testimony followed a similar pattern. He and Fields went to the liquor store after they had been drinking together for a few hours. As they were hanging out, Young listened to music with earbuds, which were still in his ears when the shooting happened. At trial, he testified he did not see the interaction between Fields and Klesath because he had turned around. Meanwhile, the surveillance video shows Young watching what happened. At the preliminary hearing, he testified he heard someone say "give me everything" but did not know who said it. At trial, he retracted that. He explained his conflicting testimony is "probably what I recalled at that time. You know what I mean. After everything took place and stuff, I tried to forget about that night."

The third and final eyewitness, John Keeling, who was not affiliated with anyone involved in the shooting, was merely walking into the liquor store when the shooting happened. He admitted "it's possible" he had been drinking before going to the store. He testified that "one guy came up to the other guy and he asked him did he have his shit. Dude said he didn't have his shit and he shot him." On cross-examination, he repeated that same story: "The guy who got shot, he said hello to the guy that shot him. And the guy turned around and he shook his hands and asked him does he have his shit and the guy said, no. He shot him."

At the conclusion of evidence, the trial court instructed the jury on self-defense, along with the other charged crimes. The jury found Klesath guilty of felony murder, second-degree intentional murder, and aggravated robbery. The district court merged the felony murder and second-degree murder convictions and sentenced Klesath for only felony murder to life in prison without the possibility of parole for 620 months.

In this direct appeal, Klesath raises the evidence's insufficiency issue and two instructional error claims. Our jurisdiction is proper. See K.S.A. 2022 Supp. 22-3601(b)(3) (life imprisonment), (4) (off-grid crime). We first address the sufficiency of the evidence argument because it disposes of the case.

SUFFICIENCY OF THE EVIDENCE OF AGGRAVATED ROBBERY

Felony murder is "the killing of a human being committed . . . in the commission of . . . any inherently dangerous felony," which includes "aggravated robbery." K.S.A. 2022 Supp. 21-5402(a)(2), (c)(1)(D). To support Klesath's felony murder conviction, the State had to sufficiently prove the predicate felony of aggravated robbery as a required element. Aggravated robbery is "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person" "committed by a person who . . . [i]s armed with a dangerous weapon; or . . . inflicts bodily harm upon any person in the course of such robbery." K.S.A. 2022 Supp. 21-5420(a), (b). We hold the State proved each element of aggravated robbery.

*Standard of review*

When a defendant challenges evidence's sufficiency, this court reviews the record in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). This standard imposes a high bar for a convicted defendant that warrants reversal "only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020). An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on witnesses' credibility. *Aguirre*, 313 Kan. at 209.

7

*Discussion*

Klesath does not dispute that he knowingly took Fields' fallen gun from his presence or that he was armed with a dangerous weapon or inflicted bodily harm while taking the gun. He argues only that he did not intend to take the victim's gun at the incident's outset. But aggravated robbery is a general intent crime, meaning that to commit the crime, a defendant does not need to specifically intend to take another's property. *State v. Edwards*, 299 Kan. 1008, 1013, 327 P.3d 469 (2014). "[*A*]*ny* taking, incidental or intentional, suffices for a robbery conviction." 299 Kan. at 1013. The statute does not require "the taking be the motivation for the crime as opposed to an incident of the crime." 299 Kan. at 1015. The State only needs to prove a defendant took property from a victim or their presence by force or by threat of bodily harm either armed with a dangerous weapon or having inflicted bodily harm, and the State has done so here. See 299 Kan. 1008, Syl. ¶ 2.

Klesath advances two self-defense arguments to negate the State's evidence proving aggravated robbery. First, he asserts he used force to respond to Fields' imminent threat of deadly force. Second, he claims he only took the gun to protect himself from being shot. Neither argument carries the day.

His first argument fails because self-defense cannot negate aggravated robbery, as the crime of aggravated robbery has no element that could justify the use of force in defense of oneself or another. See *State v. Holley*, 315 Kan. 512, Syl. ¶ 3, 509 P.3d 542 (2022). His second argument has a little more to consider because *Holley* leaves the door open to circumstances involving the disarming of an aggressor. 315 Kan. at 520 ("By way of an aside, we note that disarming an aggressor likely falls outside the scope of the statutory meaning of 'taking property' as used in K.S.A. 2020 Supp. 21-5420.").

8

But the problem with this second argument is that Klesath was not disarming an aggressor, so the narrow exception contemplated in *Holley* does not extend to him. He did not start the interaction by taking Fields' gun. Instead, he waited to take the gun until he was fleeing, as Fields lay on the ground dying. A defendant may not assert self-defense if the defendant is already attempting to commit, committing, or escaping from the commission of a forcible felony. K.S.A. 2022 Supp. 21-5226(a); *State v. Keys*, 315 Kan. 690, Syl. ¶ 17, 510 P.3d 690 (2022).

We hold the evidence sufficiently supports each element of aggravated robbery, and that self-defense cannot defeat Klesath's felony murder conviction. This holding allows us to avoid addressing the remaining instructional issues related to second-degree murder. The district court merged the two murder convictions—first- and second-degree—and sentenced him only for the greater offense.

The judgment of the district court is affirmed.